# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

RAYMOND TIBBETTS,

               Petitioner,      :      Case No. 1-03-cv-114

                                   District Judge Susan J. Dlott
    -vs-                       Chief Magistrate Judge Michael Merz
                         :

MARGARET BRADSHAW,
 Warden,

               Respondent.

---

## REPORT AND RECOMMENDATIONS

---

    This capital habeas corpus case is before the Court for decision on the merits after an evidentiary hearing.

    Petitioner was indicted on November 12, 1997, by the Hamilton County Grand Jury on four counts of aggravated murder in violation of Ohio Rev. Code § 2903.01 (A) and 2903.01 (B) and on one count of aggravated robbery.  In regard to the murder counts, Tibbetts was also charged with two death penalty specifications: 1) that the offense was committed as part of a course of conduct in which Tibbetts purposely killed or attempted to kill two or more persons; and 2) that as the principal offender Tibbetts committed the offense during the course of an aggravated robbery.  On August 11, 1998, a Hamilton County jury found Tibbetts guilty on three counts of aggravated murder with both specifications, guilty of one count of the lesser included offense of murder with both specifications and guilty of one count of aggravated robbery.

1

The jury recommended that Tibbetts be given a sentence of death for the murder of Hicks and be given life imprisonment without parole for the murder of Crawford. *Id.*  The court adopted the recommended sentence in full on August 27, 1998.  In addition Tibbetts was sentenced to ten years for aggravated robbery.

In his Petition for Writ of Habeas Corpus, Tibbetts pleads thirty grounds for relief from the imposed death sentence. (Doc. No. 5.)  Respondent, Margaret Bradshaw, (hereinafter "Respondent"), warden of the Mansfield Correctional Institute, filed a Return of Writ on August 1, 2003, asking this Court to deny Tibbetts' Petition for Writ of Habeas Corpus. (Respondent Bradshaw's Return of Writ "Return of Writ," Doc. No. 13.)  In response, Petitioner filed a traverse on October 1, 2003. (Doc. No. 14.)

### State Trial Court Proceedings

These are the facts as determined by the Ohio Supreme Court:

> On November 6, 1997, Hicks's sister, Joan Hicks Landwehr, arrived at Hicks's home in Cincinnati to meet him for lunch.  Landwehr often visited Hicks, who was sixty-seven years old and suffered from emphysema.  Due to his condition, Hicks employed Crawford as a live-in caretaker.  Tibbetts, who had married Crawford just over a month earlier, also lived in the house.
>
> After getting no answer at the door and seeing Hicks's car missing from its usual parking space, Landwehr entered the home with her spare key.  Landwehr went to a second-floor living room and found Hicks's dead body slumped in a chair.  Landwehr immediately called 911.  Landwehr noticed that her brother's chest and stomach were bloody and that his right pants packet, where Hicks usually kept his money, was turned inside out.
>
> When Cincinnati police officers responded a short time later, they found Hicks with a tube still connecting his nose to a nearby oxygen tank.  Two knives protruded from Hicks's chest, a third knife protruded from his back, and the broken blade of a fourth knife was also in his back.  Officers found additional knives and a knife sheath

2

near Hicks. A butcher block used to store knives lay behind Hicks's chair. Deputy coroner Daniel Schultz later determined that Hicks died as a result of multiple stab wounds to his chest that punctured Hicks's heart, lungs, and aorta. Hicks did not have any defensive wounds.

Officers searched the rest of the house and found Crawford lying dead on the floor of a third-floor room, covered with a sheet. Crawford had been brutally beaten; her head was cracked open and lay in a pool of blood. Pieces of Crawford's brain were lying on the floor next to her head. Crawford had also been stabbed several times, with one knife still stuck in her neck. Crawford also had a broken left arm, which Dr. Schultz characterized as a probable result of her attempt to ward off blows. Police found a bloodstained baseball bat and several knives near Crawford's body. Dr. Schultz concluded that Crawford died of multiple skull fractures and that at least nine of her stab wounds were inflicted after her death. In all, Crawford had been struck at least four times in the head with blunt-force blows and sustained stab wounds to her back, lungs, chest, arm, shoulder, and neck.

Dr. Schultz, who also investigated the crime scene, determined that Hicks and Crawford had been dead for several hours. Police investigators found no identifiable fingerprints on the baseball bat or the knives. The only fingerprints found in the house belonged to either Tibbetts or Crawford. There were no signs of forced entry anywhere in the residence. Police also learned from Landwehr and others at the scene that Hicks's car, a white Geo Metro, was missing. Landwehr told police that Tibbetts did not have permission to drive the car.

The day after discovering the bodies, Cincinnati police learned that a Covington, Kentucky police officer had stopped Tibbetts on the night of the murders. Just after midnight on November 6, 1997, Covington police lieutenant Michael Kraft found Tibbetts in a white Geo Metro that had broken down in the middle of an intersection. According to Kraft, Tibbetts appeared nervous and "smelled somewhat of intoxicants." Tibbetts also lied to Kraft about the car's owner, saying that the car belonged to a friend in Covington.

Kraft summoned another officer to the scene to assist Tibbetts and investigate whether Tibbetts was driving under the influence of alcohol or drugs. Officer David Finan arrived a short time later and also noted that Tibbetts was nervous and smelled of intoxicants. He

allowed Tibbetts to go, however, after concluding that Tibbetts was not under the influence of alcohol or drugs. The car was towed away and impounded by Covington police. Cincinnati police later recovered the Geo Metro from the Covington impoundment lot and found bloodstains on the steering wheel, gearshift, door panel, and brake handle.

After learning of the Covington police's encounter with Tibbetts, Cincinnati police charged Tibbetts with receiving stolen property and obtained an arrest warrant on November 7, 1997. The very next day, Tibbetts voluntarily admitted himself to the psychiatric unit at St. Elizabeth Hospital in Edgewood, Kentucky. Tibbetts told nurses that his name was Ray Harvey and provided an incorrect Social Security number. Despite the false name and identification information, nurses at the psychiatric unit recognized Tibbetts from his previous treatment at the hospital. On the same day that Tibbetts checked into St. Elizabeth, police arrested Tibbetts on the warrant for receiving stolen property and took him to a local jail for questioning.

Tibbetts signed a waiver of his *Miranda* rights and calmly cooperated with the two investigating officers who questioned him. Tibbetts had a noticeable cut on his hand and told the investigators he had cut his hand on a river barge where he had been staying. When an officer asked whether Tibbetts had seen his wife lately, Tibbetts responded that he had not and then terminated the interview. As police were leaving, Tibbetts queried, "What's the charge, manslaugter?" The investigators, who had not mentioned the murders to Tibbetts during the interview, responded that the matter was under investigation.

A few days later, a Cincinnati police officer retrieved from St. Elizabeth the clothing Tibbetts was wearing when he checked himself into the psychiatric unit and took it to the crime lab for DNA testing. The socks, T-shirt, and blue jeans Tibbetts was wearing on November 8, 1997, were all stained with human blood. A serologist found that the blood on Tibbetts's T-shirt matched Tibbetts's blood, that blood on the socks matched Hicks's blood, and that blood on the blue jeans matched blood from Tibbetts, Crawford, and an unknown person. The serologist also analyzed blood found in the Geo Metro and concluded that blood on the door, brake handle, and gearshift matched Tibbetts's blood.

A Hamilton County grand jury indicted Tibbetts on four counts of aggravated murder (two counts per victim) with death-penalty specifications. The first and third counts alleged aggravated murder

4

with prior calculation and design. R.C. 2903.01 (A). The second and fourth counts charged aggravated murder in the course of committing aggravated robbery. R.C. 2903.01 (B). Each count carried two death-penalty specifications: (1) a course of conduct involving the purposeful killing of two or more persons, R.C. 2929.04 (A)(5); and (2) murder while the principal offender in an aggravated robbery, R.C. 2929.04 (A)(7). A fifth count in the indictment charged Tibbetts with aggravated robbery in connection with the theft of Hicks's car. R.C. 2911.01 (A)(3).

A jury returned guilty verdicts on three counts of aggravated murder. On these counts, the jury also found Tibbetts guilty of each death-penalty specification. The jury found Tibbetts not guilty on count one, the aggravated murder of Crawford with prior calculation and design, but found him guilty of the lesser included offense of murder. R.C. 2903.02. The jury also returned a guilty verdict on the aggravated-robbery count. The trial court merged the murder verdicts into two counts for purposes of sentencing.

At the conclusion of the penalty phase, the jury recommended that Tibbetts be sentenced to death for the Hicks murder and to life imprisonment without parole for the Crawford murder. The trial court adopted the jury's recommendation and sentenced Tibbetts accordingly . . . .

*State v. Tibbetts*, 92 Ohio St. 3d 146, 147-149, 749 N.E. 2d 226, 237-239 (2001).

## Post-Trial State Court Proceedings

In his direct appeal to the Ohio Supreme Court, Tibbetts advanced the following fifteen propositions of law:

Proposition of Law No. I
The Defendant-Appellant was prejudiced by a lack of funds to adequately defend himself in this litigation. As a result, Tibbetts was deprived of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Proposition of Law No. II
The judgment of conviction on the aggravated murder counts is unsupported by legally sufficient evidence and is contrary to the

5

manifest weight of the evidence, and as a result, Appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. (Argued together.)

Proposition of Law No. III
The trial court failed to provide Appellant Tibbetts with an independent expert pathologist to assist Appellant in both the innocence/guilt and mitigation phases of his capital trial.

Proposition of Law No. IV
The trial court's failure to appoint an independent neuropharmacologist deprived Appellant Tibbetts of his statutory rights as well as his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Proposition of Law No. V
Appellant was denied reasonable bond in violation of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 9, of the Ohio Constitution.

Proposition of Law No. VI
The admission of gruesome and otherwise prejudicial photographs which were cumulative of each other as well as other evidence violated Appellant Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Proposition of Law No. VII
Requiring that mitigating factors be proven by a preponderance of the evidence violates the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

Proposition of Law No. VIII
The trial court's application of Ohio's statutory definition of reasonable doubt in the mitigation phase of Appellant's capital trial deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Proposition of Law No. IX
Ohio's death penalty law is unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev. Code §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04

and 2929.05, do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Raymond Tibbetts.

Proposition of Law No. X
A defendant is denied effective assistance of counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I, of the Ohio Constitution, when defense counsel fails to raise the issue of defendant's competency and enter a plea of not guilty by reason of insanity, when defendant has no recollection of the alleged crime, is arrested in a psychiatric unit of a hospital, has a history of mental illness, and a plea of not guilty by reason of insanity offered the most reasonable defense to the charges, and when defense counsel further failed to raise proper objections at trial.

Proposition of Law No. XI
A defendant is prejudiced when the trial court admits improper hearsay evidence, depriving the defendant of a fair trial as guaranteed by the federal and state constitutions, when the improper evidence goes to a necessary element of the prosecution's case, and where hearsay statements allegedly made by the deceased victim.

Proposition of Law No. XII
A defendant suffers prejudice when the trial court admits an inculpatory duplicate of an altered videotape which is never properly authenticated and to which there was no evidence presented regarding the process involved in the alteration of the videotape, and such evidence is introduced to prove the content of the videotape.

Proposition of Law No. XIII
A defendant is denied his right to a fair trial when the trial court allows the State to introduce evidence of "other acts" claimed to have been committed by defendant.

Proposition of Law No. XIV
A criminal defendant is prejudiced when his motion to suppress evidence is overruled despite the State's failure to demonstrate that the arrest of defendant was lawful and based upon probable cause.

Proposition of Law No. XV
Unless the State demonstrates that a criminal defendant knowingly and voluntarily waived his rights and that the totality of the

> circumstances indicate that statements were made voluntarily, the defendant's motion to suppress must be granted.

(Return of Writ, Doc. No. 13, Volume II at 35.)

After reviewing the merits of Tibbetts' claims, re-weighing the aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the penalty of death, the Ohio Supreme Court affirmed Tibbetts' conviction and sentence of death on July 5, 2001. *State v. Tibbetts*, 92 Ohio St. 3d 146, 749 N.E. 2d 226 (2001). Tibbetts then sought review by *certiorari* in the United States Supreme Court, which declined to consider the case. *Tibbetts v. Ohio*, 534 U.S. 1144 (2002).

On May 22, 1999, Tibbetts filed his petition for Post-Conviction Relief in the Hamilton County Court of Common Pleas under Ohio Revised Code § 2953.21, pleading the following sixteen claims for relief:

> First Ground for Relief
> The judgment and sentence against Raymond Tibbetts are void or voidable because the recent amendments to the Ohio post-conviction process violate his constitutional rights to procedural due process which the Ohio and United States Constitutions afford him.
>
> Second Ground for Relief
> The judgment and sentence against Raymond Tibbetts are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. In particular, counsel fell far below a minimum standard of reasonable legal representation in their failure to investigate exculpatory evidence by a crime scene expert in the trial phase of his case. As a result he was prejudiced at the initial phase of his capital trial.
>
> Third Ground for Relief
> The judgment and sentence against Raymond Tibbetts are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. In particular, counsel fell far below a minimum standard of reasonable legal representation

8

in their failed attempt to present a defense of voluntary intoxication. As a result Raymond Tibbetts was prejudiced at the initial phase of his capital trial.

Fourth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or voidable because he did not receive the effective assistance of counsel during the penalty phase of his capital trial. Counsel fell far below a minimum standard of reasonable legal representation by numerous actions and failures to act in violation of his constitutional rights as guaranteed by the United States and Ohio Constitution.

Fifth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or voidable because he did not receive the effective assistance of counsel during the penalty phase of his capital trial. Counsel fell far below a minimum standard of reasonable legal representation in conducting the mitigation phase in violation of his constitutional rights as guaranteed by the United States and Ohio Constitution.

Sixth Ground for Relief
The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by electrocution in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law.

Seventh Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. In particular, counsel fell far below a minimum standard of reasonable legal representation in their failure to investigate and present evidence to counter the damaging characterization by the state that Raymond Tibbetts gave an incorrect last name when he admitted himself to St. Elizabeth's psychiatric hospital to conceal himself from law enforcement.

Eighth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or voidable because the state failed to provide exculpatory evidence of the victim's numerous prior investigations and convictions for stabbings and violence against others in discovery at his capital trial. The State's violation of its affirmative duty to supply all relevant and exculpatory evidence is in direct violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). As a result, Mr. Tibbetts' rights to due process were

violated and he was prejudiced.

Ninth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or
voidable because he did not receive the effective assistance of
counsel during all phases of his capital trial. In particular, counsel
fell far below a minimum standard of reasonable legal representation
in their failure to investigate the background of the victim Susan
Crawford-Tibbetts and discover evidence of her prior history of
violence against others, and in particular, her history of stabbings. As
a result he was prejudiced at both phases of his capital trial.

Tenth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or
voidable because the trial court permitted the state to introduce
statements obtained from Raymond Tibbetts in violation of his
constitutional rights. As a result, Mr. Tibbets' rights to due process
were violated and he was prejudiced.

Eleventh Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or
voidable because he did not receive the effective assistance of
counsel during all phases of his capital trial. In particular, counsel
fell far below a minimum standard of reasonable legal representation
in their failure to investigate and present evidence of Raymond
Tibbetts' extremely compromised mental condition at the time he
made statements to arresting officers. As a result he was prejudiced
at both phases of his capital trial.

Twelfth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or
voidable because the trial court permitted the state to introduce
statements by nurses at St. Elizabeth's Hospital regarding Raymond
Tibbetts' statements to them as part of the admission and treatment
process and regarding their opinion of Raymond Tibbetts as a result
of their dealings with him as part of his treatment on the mental
health unit of St. Elizabeth's Hospital. As a result, Mr. Tibbetts'
rights to due process were violated and he was prejudiced.

Thirteenth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or
voidable because he did not receive the effective assistance of
counsel during all phases of his capital trial. In particular, counsel
fell far below a minimum standard of reasonable legal representation
in their failure to investigate exculpatory evidence at the crime scene

10

and to permit their investigator access to vital evidence necessary for him to conduct an effective investigation in the trial phase of his case. As a result he was prejudiced at the initial phase of his capital trial.

Fourteenth Ground for Relief
The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by lethal injection in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law.

Fifteenth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or voidable because the state failed to permit defense counsel's investigator to view, analyze and examine the evidence in this case, which actions amounted to a failure to disclose the evidence to trial counsel in any meaningful way. This violation of its affirmative duty to supply all relevant and exculpating evidence is in direct violation of Brady v. Maryland, 373 U.S. 83(1963). As a result, Mr. Tibbetts' rights to due process were violated and he was prejudiced.

Sixteenth Ground for Relief
The judgment and sentence against Raymond Tibbetts are void or voidable because he did not receive the effective assistance of counsel during his capital trial. Counsel fell far below a minimum standard of reasonable legal representation by numerous actions and failures to act in violation of his constitutional rights as guaranteed by the United States and Ohio Constitutions.

(Return of Writ, Doc. No. 13, Apx. Vol. III-A at 19-79.)

The Court of Common Pleas for Hamilton County found that Tibbetts was not entitled to relief on any of his claims and denied the petition for post-conviction relief on cross-motions for summary judgment. *State v. Tibbetts*, No. B-9708596 (Hamilton C.P. March 22, 2000.)

He appealed to the Court of Appeals from the denial of post-conviction relief. *State v. Tibbetts*, 2001 Ohio App. LEXIS 1472 (1st Dist. Ohio 2001) (denying post-conviction); raising the following assignments of error:

First Assignment of Error
The trial court erred in dismissing Mr. Tibbetts' post-conviction

11

petition without granting his request for discovery.

<u>Issues Presented for Review and Argument</u>
1.    A trial court cannot summarily dismiss a post-conviction petition without affording the Petitioner an opportunity to gain equal access to evidence necessary to justify his opposition to summary dismissal and/or to develop and support his claims after State misconduct becomes apparent.

Second Assignment of Error
The trial court erred when it denied Appellant Tibbetts an evidentiary hearing in violation of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendment of the United States Constitution and Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

<u>Issues Presented for Review and Argument</u>
1.    A trial court cannot deny an evidentiary hearing to a post-conviction petitioner when his petition is sufficient on its face to raise constitutional claims which depend on factual allegations that cannot be determined from the record.

Third Assignment of Error
The trial court erred in dismissing Appellant Tibbetts' post-conviction action in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 10, and 16 of the Ohio Constitution.

<u>Issues Presented for Relief and Argument</u>
1.    The trial court erroneously granted the Respondent-Appellee's Motion to Dismiss.
2.    A trial court may not use the doctrine of res judicata to preclude the consideration of a claim when such claim is supported by credible evidence dehors the record.

(Return of Writ, Doc. No. 13, Apx. Vol. IV at 18-59.)

The court of appeals affirmed the dismissal of the post-conviction petition. *State v. Tibbetts*, 2001 Ohio App. Lexis 1472 (1st Dist. Ohio 2001.) Tibbetts then appealed to the Ohio Supreme Court which declined to review the judgment of the lower courts based on jurisdictional grounds and failure to raise a substantial constitutional question. *State v. Tibbetts*, 93 Ohio St. 3d 1409, 754 N.E.

12

2d 258 (2001.)

On October 2, 2001, Tibbetts filed an Application to Reopen his direct appeal under Ohio

R. App. P. 26(B), alleging that his direct appeal counsel had been constitutionally ineffective for

their failure to raise thirty-five propositions of law:

> Proposition of Law No. 1
> Trial counsel failed to provide effective assistance of counsel when they failed to make an informed and sound decision to present exculpatory evidence by an expert qualified to evaluate the crime scene, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.
>
> Proposition of Law No. 2
> Trial counsel failed to provide effective assistance of counsel when they failed to fully investigate and present a valid request for the assistance of an expert and other evidence in support of a defense of voluntary intoxication in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.
>
> Proposition of Law No. 3
> Trial counsel failed to provide effective assistance of counsel when they failed to fully investigate and present a qualified expert to present compelling and meaningful evidence at mitigation regarding the impact of the numerous prescription and non-prescription drugs on the Defendant's mental status at the time of the alleged killings, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.
>
> Proposition of Law No. 4
> Trial counsel failed to provide effective assistance of counsel when they failed to call even one family member to detail the readily available mitigating evidence of the tragic failure of the state's protective services to protect him from horrible abuses by those charged with his care, the nightmare of abuse and complete lack of love and nurturing that was his childhood and the impact of the tragedy on his mental health in spite of the fact that the psychological expert alluded to the availability of this evidence at trial in violation

13

of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 5
Counsel failed to provide effective assistance of counsel when they failed to raise and argue the meritorious issue that the Defendant's conviction and sentence is void or voidable because the death penalty as administered by electrocution and lethal injection the state of Ohio violated his constitutional rights, in violation of Mr. Tibbetts' rights under the Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 6
Trial counsel failed to provide effective assistance of counsel when they failed to counter the damaging characterization by the state that Raymond Tibbetts gave an incorrect last name when he admitted himself to St. Elizabeth's psychiatric hospital to conceal himself from law enforcement, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 7
The trial court erred when it permitted the state to introduce statements by nurses treating Raymond Tibbetts' [sic] regarding his statements to them as part of the admission and treatment process, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 8
Trial counsel failed to provide effective assistance of counsel when they failed to make a meritorious request for the assistance of an independent expert pathologist to assist in the defense investigation of this case, despite evidence of the need for same, and to present such evidence at trial, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 9
The trial court erred when it permitted erroneous information to be given to the prospective jurors during voir dire, that led them to believe that the responsibility for determining the appropriateness of the death sentence lay elsewhere, in violation of Mr. Tibbetts' rights

14

under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 10
The trial court [erred] in the guilt phase when defining the term "reasonable doubt", in violation of Mr. Tibbets' rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 11
The trial court [sic] in the penalty phase when defining the term "reasonable doubt", in violation of Mr. Tibbets' rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 12
The trial court erred when it failed to instruct the jury in the sentencing phase of Mr. Tibbetts' trial that Mr. Tibbetts enjoyed a presumption of life, in violation of Mr. Dennis' [sic] rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 13
The trial court erred when it failed to adequately define the term "outweigh" in its sentencing instructions to the jury, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 14
The trial court erred when it permitted the action of Mr. Tibbetts' trial counsel during the mitigation phase of the trial to not meet the standards for Ohio counsel in a capital case and Mr. Tibbetts was prejudiced by this deficient performance, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 15
The trial court erred when it failed to rule that Ohio's death penalty violated various international laws and treaties entered into by the United States Senate, including but not limited to the organization [sic] of American States Treaty and the American Declaration of the

Rights and Duties of Man.

Proposition of Law No. 16
The failure of the trial courts to file sentencing opinions in cases in which the jury has returned a life verdict has resulted in Ohio appellate courts conducting a biased and incomplete proportionality review, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 17
The trial court erred during void dire when prospective jurors were repeatedly misinformed concerning life sentence options, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 18
The trial court erred when it charged the jury that the responsibility for determining the appropriateness of the death sentence lay elsewhere, in violation of Mr. Tibbetts' rights under the Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 19
The trial court erred when it instructed the jury as to the mandatory nature of the death penalty, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 20
The trial court erred when it omitted an appropriate definition of the requisite burden of proof in its mitigation charge to the jury, in violation of Mr. Tibbetts' rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 21
The trial court erred when it provided a "no sympathy charge" to the jury in the guilt and mitigation instruction, in violation of Mr. Tibbetts' rights under the Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 22
The trial court erred when it did not require that the grand jury proceedings be recorded, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 23
The trial court erred when it failed to dismiss the death penalty specification because R.C. 2929.03 (D)(1) is unconstitutional, it fails to require an examination and investigation of death eligible persons which results in incomplete sentencing information and therefore, Mr. Tibbetts' death sentence is unreliable, in violation of his rights under the Fifth, Eighth and Fourteenth Amendment to the United States Constition, and corresponding state constitutional provisions.

Proposition of Law No. 24
The trial court erred when it failed to dismiss the indictment because death sentences are imposed in Hamilton County in a racially discriminatory manner, in violation of Mr. Tibbetts' rights under the Fourteenth Amendment to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 25
The trial court erred in its sentencing opinion in failing to conduct a meaningful, independent review of the jury's death recommendation, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 26
The trial court erred when it gave improper jury instructions at the guilt phase of the trial, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 27
The trial court erred when it weighed multiple aggravating circumstances in imposing the death penalty, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 28
The trial court erred by permitting prosecutorial misconduct during

17

the capital trial in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 29
The trial court erred when it did not conduct a meaningful proportionality review, in violation of Mr. Tibbetts' rights under the Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 30
The trial court erred when it imposed the death sentence, which was not based upon sufficient evidence to prove that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt, in violation of Mr. Tibbetts' rights under the Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 31
The trial court erred when it failed to consider all relevant information, which supported the imposition of a sentence of less than death, in violation of Mr. Tibbetts' rights under the Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 32
Mr. Tibbetts was denied a fair and impartial jury because those individuals selected for his venire were not required to be a member of his venire and this his special venire did not reflect a fair cross-section of the community, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 33
The trial court erred when it admitted testimony whose sole purpose it was to elicit sympathy from the jury, in violation of Mr. Tibbetts' rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution , and corresponding state constitutional provisions.

Proposition of Law No. 34
The trial court erred when it permitted Mr. Tibbetts to receive ineffective assistance of counsel, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution, and corresponding state constitutional provisions.

Proposition of Law No. 35
The legal proceedings against Mr. Tibbetts contained too many errors to result in a reliable imposition of the death penalty, in violation of Mr. Tibbetts' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corresponding state constitutional provisions.

(Return of Writ, Doc. No. 13 Apx. Vol. VI.)

The Ohio Supreme Court denied Tibbetts' Application for Reopening on December 5, 2001.[1]

(Return of Writ, Doc. No. 13 at 46.)

---

[1] The extent of which states, "IT IS ORDERED by the Court that the application for reopening be, and hereby is, denied." (Return of Writ, Doc. No. 13, Apx. Vol. VI at 31.)

### Proceedings in this Court

Tibbetts filed his Notice of Intention to file his habeas Petition on February 12, 2003. (Doc.

No. 2.)  He filed a petition in the this Court on February 18, 2003 raising the following thirty

grounds for relief:

> First Claim for Relief
> Petitioner's right to due process was violated by the amendments to
> the Ohio post-conviction process.
>
> Second Claim for Relief
> Petitioner's right to due process was violated by the ineffective
> assistance of counsel in failing to investigate exculpatory evidence
> through a crime scene expert at the trial of his case.
>
> Third Claim for Relief
> Petitioner's right to due process was violated by the ineffective
> assistance of counsel at trial when legal counsel failed to present a
> defense of voluntary intoxication.
>
> Fourth Claim for Relief
> Petitioner's right to due process was violated by the ineffective
> assistance of counsel at trial when trial counsel failed to develop and
> present evidence regarding the mental status of petitioner at the
> penalty phase of his capital trial.
>
> Fifth Claim for Relief
> Petitioner's right to due process was violated by the ineffective
> assistance of trial counsel in failing to present mitigating evidence at
> the penalty phase of his capital trial.
>
> Sixth Claim for Relief
> Petitioner's constitutional rights to freedom from cruel and unusual
> punishment and due process of law were violated by the presumptive
> use of electrocution in carrying out a death sentence in Ohio at the
> time of petitioner's death sentence.
>
> Seventh Claim for Relief
> Petitioner's right to due process was violated by the ineffective
> assistance of trial counsel in failing to investigate and present
> evidence to counter the damaging characterization by the state that
> petitioner was deceptive and attempted to conceal himself from law

enforcement.

Eighth Claim for Relief
Petitioner's right to due process was violated by the prosecutor's failure to provide exculpatory evidence of the victim's violent history at his capital trial.

Ninth Claim for Relief
Petitioner's right to due process was violated by the ineffective assistance of trial counsel in failing to investigate, discover and present evidence of the victim's prior history of violence at his capital trial.

Tenth Claim for Relief
Petitioner's right to due process was violated when the trial court permitted the state to introduce statements obtained from Raymond Tibbets [sic] in violation of his constitutional rights.

Eleventh Claim for Relief
Petitioner's right to due process was violated by the ineffective assistance of trial counsel in failing to investigate and present evidence of his drugged and extremely compromised mental condition at the time he made statements to officers, at his capital trial.

Twelfth Claim for Relief
Petitioner's right to due process was violated when the trial court permitted the state to introduce statements made by Petitioner to nurses during a part of the admission and treatment process, at his capital trial.

Thirteenth Claim for Relief
Petitioner's right to due process was violated by the ineffective assistance of trial counsel in failing to investigate exculpatory evidence at the crime scene and to permit their investigator to access vital evidence necessary to conduct an effective investigation [sic] his capital trial.

Fourteenth Claim for Relief
Petitioner's constitutional rights were violated by the administration of the death penalty by lethal injection in the state of Ohio.

Fifteenth Claim for Relief
Petitioner's right to due process was violated when the state failed to

permit defense counsel's investigator to view, analyze and examine the evidence in his case at his capital trial.

Sixteenth Claim for Relief
Petitioner's right to due process was violated by the ineffective assistance of trial counsel in their numerous actions and failure to act on his behalf during their representation at his capital trial.

Seventeenth Claim for Relief
Petitioner's right to due process was violated by the admission of gruesome and otherwise prejudicial photographs which were cumulative of each other as well as other evidence.

Eighteenth Claim for Relief
Petitioner's right to due process was violated by the requirement that the mitigating factors in his capital sentencing proceeding be proven by a preponderance of the evidence.

Nineteenth Claim for Relief
Petitioner's right to due process was violated by the Ineffective[sic] assistance of counsel in Petitioner's direct appeal to the Ohio Supreme Court.

Twentieth Claim for Relief
Petitioner's right to due process was violated by a lack of funds to adequately defend himself in this litigation.

Twenty-First Claim for Relief
Petitioner's right to due process was violated because the judgment of conviction of aggravated murder is unsupported by legally sufficient evidence and is contrary to the manifest weight of the evidence.

Twenty-Second Claim for Relief
Petitioner's right to due process was violated because Petitioner was denied reasonable bond.

Twenty-Third Claim for Relief
Petitioner was denied effective assistance of counsel by defense counsel's failure to raise the issue of his competency and enter a plea of not guilty by reason of insanity, as Petitioner has no recollection of the alleged crime, was arrested in the psychiatric unit of a hospital, had a history of mental illness and the plea offered a reasonable to[sic] defense to the charges and also, where counsel failed to make

22

proper objections at trial.

Twenty-Fourth Claim for Relief
Petitioner was denied due process when the trial court admitted improper hearsay evidence which evidence related to proof of a necessary element of the prosecution's case.

Twenty-Fifth Claim for Relief
Petitioner was denied due process when the trial court admitted an inculpatory duplicate of an altered videotape which was never properly authenticated and to which there was no evidence presented regarding the process involved in the alteration of the videotape, and the evidence was introduced to prove the actual content of the videotape.

Twenty-Sixth Claim for Relief
Petitioner was denied due process when the trial court allowed the state to introduce evidence of "other acts" claimed to have been committed by the Petitioner.

Twenty-Seventh Claim for Relief
Petitioner was denied due process when the trial court denied his motion to suppress evidence despite the state's failure to demonstrate that the arrest of Petitioner was lawful and based upon probable cause.

Twenty-Eighth Claim for Relief
Petitioner was denied due process when the trial court denied his motion to suppress statements made by Petitioner, where the state failed to demonstrate that those statements were made after a knowing and voluntary waiver of his rights.

Twenty-Ninth Claim for Relief
Petitioner was denied due process when the trial court applied Ohio's statutory definition of reasonable doubt in the mitigation phase of his capital trial.

Thirtieth Claim for Relief
Petitioner was tried, convicted and sentenced to death under an invalid death penalty scheme and hence an unconstitutional death penalty law and was denied his rights a[sic] guaranteed by the U.S. Const. Amend. V, VI, VIII, IX, XIV.

(Petition, Doc. No. 5.)

Respondent Bradshaw filed a Return of Writ on August 1, 2003. (Doc. No. 13.)  On March 1, 2004, the Court granted Petitioner's Motion to Expand the Record.  Additionally, on April 15, 2003, this Court granted Mr. Tibbetts' Motion for Evidentiary Hearing to present Drs. Kandiko and Ort. (Doc. 29).  The Court held an evidentiary hearing on September 20, 2004.

**Standard of Review and Generally Applicable Law**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed and took effect on April 24, 1996.  Tibbetts filed his Petition on February 18, 2003. (Doc. No. 5.)  As Tibbetts' petition was submitted after the Act was signed it is subject to its provisions.  28 U.S.C. §2254(d) of the United States Code, chapter 153, as amended by the AEDPA, provides:

> (d)　An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim-
>
> > (1)　resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)　resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Any factual finding made by the state court is presumed to be correct and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).  A state

court's decision is contrary to the Supreme Court's clearly-established precedent if (1) the state court applies a rule that contradicts the governing law as set forth by the Supreme Court case law, or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nonetheless arrives at a result different from Supreme Court precedent. *Terry Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court] but unreasonably applies it to the facts of the particular state prisoner's case," "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407-08.

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the petitioner is "actually innocent." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). To meet the "actual innocence" standard the petitioner must demonstrate that "it is more likely than not that no reasonable fact finder would have found petitioner guilty beyond a reasonable doubt" or "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Schlup v. Delo*, 513 U.S. 298 (1995)(articulating the necessary standard to prove actual innocence of the crime in which the petitioner was convicted); *Sawyer v. Whitley*, 505 U.S. 333, 336, 350

(1992)(setting forth standard for which applies the *Schlup* "actual innocence" standard to the sentencing phase of the trial.)

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982).  Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainright v. Sykes*, 433 U.S. 72, 87 (1977).  *Wainright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainwright v. Sykes*, 433 U. S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).  Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

As is well-established (although sometimes muddled by courts), two

types of procedural barriers might preclude federal review of claims in a habeas petition. The first type, procedural default, is a judicially created rule, grounded in fealty to comity values and requiring federal courts to respect state court judgments that are based on an "independent and adequate" state procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 732, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (establishing a four-part test for determining whether a procedural rule is an independent and adequate state ground). In procedural default cases, the state court or courts reject a direct or post-conviction appeal because the defendant failed to comply with some state law or rule concerning timeliness, pleading requirements, sufficient evidence, or the like.

The second type of bar, exhaustion, is similarly grounded in respect for state court procedures, but it is federally mandated by AEDPA, see 28 U.S.C. § 2254(b)(1)(A), (c), and requires petitioners to give state courts a "fair opportunity" to assess petitioners' claims. O'Sullivan, 526 U.S. at 844. Often, federal courts will rule that a petitioner's claim is "defaulted" because the petitioner failed to exhaust his remedies and the time for refiling an appeal in the state court has passed. The unexhausted claim is then classified as "procedurally defaulted" and deemed forfeited absent a showing of cause and prejudice. *See In re Cook*, 215 F.3d 606, 607-08 (6th Cir. 2000). . . .

But exhaustion and procedural default are distinguishable in an important sense. A defendant could fail to exhaust a claim without procedurally defaulting if he could return to the state courts to exhaust. Alternatively, as in this case, the defendant could fail to exhaust without defaulting if a clarification in procedural law indicates that he has already taken the necessary action to exhaust. That is, forfeiture by failure to exhaust entails a legal fiction, of sorts. The state court has not rejected an appeal based on a state rule violation; there is no declaration by the state court of an independent and adequate state ground to which the federal court must defer. Instead, the federal court makes a presumption that the state court would reject the appeal on independent and adequate state grounds if the petitioner tried to file it. But, by declaring the claim forfeited, the federal court saves the petitioner and the state court from respectively preparing and rejecting a futile filing. The federal court then views the claim through the lens of procedural default to determine whether there is cause and prejudice to excuse the default. In short, the crux of forfeiture by failure to exhaust is that the federal

27

> court's default decision rests upon a presumption about what the state
> court would do, rather than respect for what a state court actually did.

*Abdur'Rahman v. Bell (In re Abdur'Rahman)*, 392 F.3d 174, 186-187 (6th Cir. 2004).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that
> is applicable to the petitioner's claim and that the petitioner failed to
> comply with the rule.
>
> . . . .
>
> Second, the court must decide whether the state courts actually
> enforced the state procedural sanction, *citing County Court of Ulster
> County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777
> (1979).
>
> Third, the court must decide whether the state procedural forfeiture
> is an "adequate and independent" state ground on which the state can
> rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not
> complied with and that the rule was an adequate and independent
> state ground, then the petitioner must demonstrate under *Sykes* that
> there was "cause" for him to not follow the procedural rule and that
> he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F.2d at 138.

The general governing standard for effective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so

28

defective as to require reversal of a conviction or death sentence has
two components.  First, the defendant must show that counsel's
performance was deficient.  This requires showing that counsel was
not functioning as the "counsel" guaranteed the defendant by the
Sixth Amendment.  Second, the defendant must show that the
deficient performance prejudiced the defense.  This requires showing
that counsel's errors were so serious as to deprive the defendant of a
fair trial, a trial whose result is reliable.  Unless a defendant makes
both showings, it cannot be said that the conviction or death sentence
resulted from a breakdown in the adversary process that renders the
result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

Judicial scrutiny of counsel's performance must be highly
deferential. . . .  A fair assessment of attorney performance requires
that every effort be made to eliminate the distorting effects of
hindsight, to reconstruct the circumstances of counsel's challenged
conduct, and to evaluate the conduct from counsel's perspective at
the time.  Because of the difficulties inherent in making the
evaluation, a court must indulge a strong presumption that counsel's
conduct falls within a wide range of reasonable professional
assistance;  that is, the defendant must overcome the presumption
that, under the circumstances, the challenged action "might be
considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

The defendant must show that there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the proceeding
would have been different.  A reasonable probability is a probability
sufficient to overcome confidence in the outcome.

466 U.S. at 694; *see also Darden v. Wainright*, 477 F.3d 168 (1986); *Wong v. Money,* 142 F.3d 313,

319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987); *see generally* Annotation, 26

ALR Fed 218.

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial,

counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988). Counsel must be appointed on appeal of right for indigent criminal defendants. *Douglas v. California*, 372 U.S. 353 (1963); *Anders v. California*, 386 U.S. 738 (1967); *United States v. Cronic,* 466 U.S. 648 (1984). The right to counsel is limited to the first appeal as of right. *Ross v. Moffitt*, 417 U.S. 600 (1974); *Lopez v. Wilson*, 426 F.3d 339 (6th Cir. 2005). The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987). The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." 463 U.S. 751-52). Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *See Smith v. Murray*, 477 U.S. 527 (1986). However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland,* 466 U.S. 668; and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th

Cir. 2001), *cert. denied,* 535 U.S. 940 (2002).  "Counsel's performance is strongly presumed to be effective." *McFarland,* 356 F.3d at 710 *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*).

> In *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), the court wrote that ... the following considerations ought to be taken into account in determining whether an attorney on direct appeal performed reasonably competently.
> (1) Were the omitted issues 'significant and obvious'?
> (2) Was there arguably contrary authority on the omitted issues?
> (3) Were the omitted issues clearly stronger than those presented?
> (4) Were the omitted issues objected to at trial?
> (5) Were the trial court's rulings subject to deference on appeal?
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> (7) What was appellate counsel's level of experience and expertise?
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
> (9) Is there evidence that counsel reviewed all the facts?
> (10) Were the omitted issues dealt with in other assignments of error?
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?
>
> Manifestly, this list is not exhaustive, and neither must it produce a correct "score"; we offer these inquiries merely as matters to be considered.

171 F.3d at 427-28 (6th Cir. 1999)(citations omitted).

## Analysis

**First Ground for Relief**

> Petitioner's right to due process was violated by the amendments to
> the Ohio post-conviction process.

In his first ground for relief Tibbets argues that his right to due process was violated by

amendments to Ohio's post-conviction relief process. (Petition, Doc. No. 5 at 1.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 5.)


**Second Ground for Relief**

> Petitioner's right to due process was violated by the ineffective
> assistance of counsel in failing to investigate exculpatory evidence
> through a crime scene expert at the trial of his case.

In his second ground for relief Petitioner asserts that his rights were violated because of

ineffective assistance of counsel in their failure to have a crime scene expert investigate the crime

scene for exculpatory evidence. (Petition, Doc. No. 5 at 3-4.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 5.)


**Third Ground for Relief**

> Petitioner's right to due process was violated by the ineffective
> assistance of counsel at trial when legal counsel failed to present a
> defense of voluntary intoxication.

In his third ground for relief Tibbetts makes the argument that his rights were violated as a

result of his counsels' ineffectiveness in their failed attempt to present a defense of voluntary

intoxication at the guilt phase of his trial. (Petition, Doc. No. 5 at 5-7.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No.

13 at 24.)  The First District Court of Appeals decision held that Tibbetts had failed to meet the

*Strickland* standard as he was not able to show that his counsel was deficient or that he was prejudiced as a result of counsels' failure to argue that he was so intoxicated he could not form the requisite specific intent. The court based this decision on circumstances surrounding the murders and Petitioner's actions immediately thereafter. *State v. Tibbetts*, 2001 Ohio App. LEXIS 1472, *11-19 (1st Dist. Ohio 2001). Respondent argues that this decision was neither contrary to nor an unreasonable application of clearly established United States Supreme Court law. *Id*. at 21-25.

In order to prevail on this claim Petitioner must be able to show that counsels' performance was deficient, rendering it ineffective. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In evaluating whether or not the representation of counsel fell into the category of ineffectiveness it must be evaluated for "reasonableness under prevailing professional norms." *Id*. Next, Petitioner must be able to show that he was prejudiced by the ineffectiveness of counsel. *Strickland*, 466 U.S. at 680. Prejudice results when a defendant is deprived of a fair trial. *Id*. To demonstrate prejudice a petitioner must show that there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different. *Id*. at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

At the time of the crime, the law in Ohio stated that "evidence of voluntary intoxication 'may be considered in determining whether an act was done intentionally or with deliberation and premeditation.'" *Hicks v. Collins*, 384 F.3d 204, 214 (6th Cir. 2004), *quoting Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000), *quoting State v. Fox,* 68 Ohio St. 2d 53, 55, 428 N.E. 2d 410, 412 (1981); *see also State v. Wolons,* 44 Ohio St. 3d 64, 68, 541 N.E. 2d 443, 446 (1989). Voluntary intoxication is a defense to a crime where specific intent is a necessary element of the crime and "the intoxication was such as to preclude the formation of such intent . . . ." *State v. Fox*, 68 Ohio St. 2d

at 55; *State v. Otte*, 74 Ohio St. 3d 555, 564, 660 N.E. 2d 711, 720 (1996); (Traverse, Doc. No. 14 at 6.)

Even assuming Tibbetts' trial counsels' decision not to fully investigate and pursue a voluntary intoxication defense was the result of mistake rather than strategy, the evidence does not demonstrate that Tibbetts was prejudiced by the alleged error. The evidence supports a conclusion that Tibbetts had been consuming alcohol and drugs excessively,[2] in the hours preceding the murder. But impairment does not equal incapacity. The evidence also demonstrates that the perpetrator acted in a deliberate manner. The victims were not stabbed once or twice haphazardly but rather were stabbed multiple times in a methodical manner. In the case of Hicks, all his wounds were in the front center of the chest as if the killer were deliberately aiming for the heart; in fact four of the six stab wounds did penetrate his heart. (T.p. 1030, 1039.) Likewise, Crawford's injuries demonstrate a similar intent to kill. She had at least four blunt impacts to the head and multiple post-mortem wounds including: a wound to the neck, a tight grouping of 8 wounds to her left side, 10 wounds to her upper back (18 including superficial wounds), and 19 wounds to the chest, some of which

---

[2] At trial Tibbetts presented testimony detailing his use of substances the day of the murders. He had spent a large portion of his day at a bar. (T.p. 673-4.) He and Sue later returned home and continued to drink and do drugs. (T.p. 698.) In addition to smoking crack and drinking, Tibbetts had also ingested anti-depressants, Darvocet, Valium, Motrin 800 and shots of cortisone. (T.p. 659, 1139, 1155.) He does not remember having done anything out of the ordinary that day, drinking vodka, taking pills, smoking crack, though he states that he blacked out on this day like he had never done before. (T.p. 1190.)

In addition to the evidence presented about Tibbetts' substance abuse on that day there was evidence presented during the trial about his long-term substance abuse. Tibbetts has been abusing substances since he was about 15 years old. (T.p. 1117.) He testified he struggled with addiction everyday and would attempt to become sober only to relapse. (T.p. 694, 709.) His substance abuse affected his relationships with others, including Robin Amburgey. It was not uncommon for Tibbetts to go off and drink and do drugs and then ask for forgiveness from Robin. (T.p. 702.) Tibbetts smoked crack almost everyday and would spend between $50-60 per day on crack cocaine. (T.p. 1126, 1128, 1130, 1180.) In addition he would drink a bottle of vodka a day, spending between $30-40 a week on vodka. (T.p. 1129, 1180.)

Additionally, evidence was presented that Tibbetts suffered from depression and had been hospitalized on multiple occasions. (T.p. 922, 1138.) Tibbetts was put on anti-depressants. (T.p. 1137.)

34

penetrated the sternum. *Id*. at 1047, 1054-7.  After her death her body was covered with a blanket. It should also be noted that the victims were killed separately on different floors of the house.

Additionally, evidence was presented as to Petitioner's demeanor shortly after the murders. He calmly answered a phone call from Crawford's sister and told her that Sue could not come to the phone as she was sleeping. (T.p. 660.)  He later placed a call to Robin Amburgey asking for her forgiveness. *Id*. at 690-691.  Amburgey testified that he did not sound depressed as he had in prior phone calls but rather "his tone of voice didn't have stress in it, he was chipper . . . . back to his self." *Id*. at 690-691, 711.  Tibbetts then left the house in Hicks' car.  When Covington Police officers came to Tibbetts' aid for the stalled vehicle, he lied to them by stating he had "borrowed" his friend's car.  Tibbetts wandered around in Kentucky for days, breaking into a barge and later a trailer for shelter as opposed to simply returning home.

Finally, it should be noted that multiple people spoke with Tibbetts after the murders.  Both Roseann Crawford and Robin Amburgey spoke with Tibbetts on the phone and neither had the impression he was intoxicated. (T.p. 660, 694, 711.)  The officers, one of whom is a specialist with the DUI unit, testified that while Tibbetts did smell of intoxicants, he did not appear to be drunk. *Id*. at 717, 728.

Even if Tibbetts' attorneys made a serious error in their understanding of the law respecting the intoxication defense and its impact on the element of specific intent, no prejudice flowed from the error as Tibbetts was in fact capable of acting with intent and deliberation as evidenced by his actions during and immediately after the murders.  Therefore, prejudice cannot be shown.  The decision of the state courts was neither contrary to nor an unreasonable application of law.  This ground for relief is without merit.

**Fourth Ground for Relief**

> Petitioner's right to due process was violated by the ineffective assistance of counsel at trial when trial counsel failed to develop and present evidence regarding the mental status of petitioner at the penalty phase of his capital trial.

In his fourth ground for relief, Petitioner claims his counsel were ineffective in that they failed to develop and present evidence relating to Petitioner's mental status. (Petition, Doc. No. 5 at 8-10.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 27.)  The court of appeals held that Tibbetts' counsel were not deficient in failing to pursue a pharmacological defense. (Return of Writ, Doc. No. 13 at 26-29.)

Again, this Court must apply the *Strickland* standard in determining whether counsel was ineffective.  In this claim Petitioner specifically argues that counsel were ineffective in their failure to develop evidence regarding the effect of numerous drugs on his mental status, specifically that they failed to hire an expert in pharmacology. (Petition, Doc. No. 5 at 9.)

Trial counsel did in fact attempt to present some of the information through their psychiatric expert witness, Dr. Weaver.  In additional to personal interviews, Dr. Weaver conducted tests, such as neuropsychological testing, in an attempt to discover Tibbetts' state of mind and ability to form intent.  He found that:

> He[Tibbetts] was an individual with limited personality resources or a personality control.  That he was subject to instances of explosiveness rage.  And that particularly, with the use of alcohol or with drugs, he would have no ability to control the impulses which he might feel . . . .
>
> * * * *

36

For example, he might even have dissociative episodes which he might do things which he would have no recall for later.  Sort of like reports that one has seen of multiple personalities . . . .

* * * *

So we know that he was doing that [snorting cocaine], and we know that he was drinking, because he was in a local bar before this, drinking.  Drinking heavily and was taking Valium and these other preparations.  He, in essence, was stoned at that time.  And people who are in this type of behavior, they do have dissociative reactions.

* * * *

His capacity was substantially reduced.  His ability to conform his conduct, certainly to requirements of the law, they weren't there.  He didn't have it.  And one would anticipate that an individual that is addicted to drugs, they may start out in the beginning, their experiences with drugs or alcohol are on a purely social basis, for the thrill of it.  And after that, they get hooked, they have no control over that whatsoever.  It's beyond their control. . . . They don't do it intentionally.  They can't stop.  They can't keep themselves from doing it.

(T.p. 1431-2, 1449-50.)

An evidentiary hearing on this ground for relief was held before this Court on September 20, 2004, during which testimony was presented from Dr. Ort and from pharmacologist, Dr. Kandiko. (Evidentiary Hearing, "Evid. Hrg"Doc. No. 32); (Evid. Hrg. T.p., Doc. No. 34.)  Dr. Kandiko testified that it is possible that memory can be affected by ingesting various substances. Additionally he stated that there is evidence of people having an aggressive episode while on a cocaine high but having no recall for the event afterwards. (Evid. Hrg T.p. 20.)  He differentiated this type of memory loss from that caused by alcohol, which over a long duration of abuse can cause Wernicke-Korsakoff's Syndrome, a disease which produces symptoms similar to those in Alzheimers cases. *Id*. at 20-21.  Dr. Kandiko felt that Tibbetts' aggressive actions were an effect caused by his intake of alcohol and drugs. *Id*. at 25.  Dr. Kandiko, however, could not give an

37

opinion as to whether or not Tibbetts really suffered memory loss. *Id*. at 23-25. Likewise, while he could say within scientific certainty that Tibbetts was in fact impaired by the substances he had ingested the day and evening of the murders, he could not say if the impairment affected Tibbetts' ability to form purpose and intent. *Id*. at 23, 32.

Dr. Ort stated both in her original report and while testifying before this Court her belief that a pharmacologist was necessary to assist Tibbetts in the mitigation phase of his trial. *Id*. at 46-7, 52. This Court acknowledges that the addition of a pharmacology report strengthened Dr. Ort's original position but that it did not add nor change information given in Dr. Ort's original report.

Based on the testimony from Dr. Weaver, Dr. Kandiko, and Dr. Ort, it seems that Dr. Weaver's testimony on the consumption of alcohol and drugs and how this may have affected Tibbetts' state of mind was detailed and thorough. Tibbetts has failed to show how he was prejudiced under *Strickland* without additional testimony from a pharmacologist. The decision of the state courts was neither unreasonable nor a contrary application of federal law. This claim is without merit.

**Fifth Ground for Relief**

> Petitioner's right to due process was violated by the ineffective assistance of trial counsel in failing to present mitigating evidence at the penalty phase of his capital trial.

Next Tibbetts claims that his counsel were ineffective in that they failed to present mitigation evidence at the penalty phase of the trial. (Petition, Doc. No. 5 at 11-19.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 31.) It is argued that the state courts reasonably concluded that counsel was not deficient nor

38

did Tibbetts suffer any prejudice from the alleged failures. *Id*. at 31-35.

The American Bar Association has adopted Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. (1989); (2003). The Supreme Court of the United States has held that these guidelines "provide the guiding rules and standards to be used in defining the "prevailing professional norms."" *Wiggins v. Smith*, 539 U.S. 510 (2003)(reinforcing rulings in *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995); *Austin v. Bell*, 126 F.3d 843, 847-48 (6th Cir. 1997); *Coleman v. Mitchell*, 268 F.3d 417, 449-52 (6th Cir. 2001)). The Sixth Circuit held in *Hamblin* that the standards of the 1989 ABA rules merely represented:

> a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*. They are the same type of longstanding norms referred to in *Strickland* in 1984 as "prevailing professional norms" as "guided" by "American Bar Association standards and the like."

*Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003). The Guidelines provide that:

Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (C), p 93 (1989) . . . .

> [T]hat among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p 133

*Wiggins*, 539 U.S. 510 (emphasis in original).

Tibbetts argues that additional mitigation testimony was available and could have been

presented to give the jury a better understanding of his development throughout his childhood and adolescent years. (Petition, Doc. No. 5 at 11-19.) Specifically he argues the following areas of his life could have been more fully developed for mitigation purposes:

1.  Testimony regarding the tragic failure of the state's children's protective services to protect Raymond Tibbetts from horrible abuses by those charged with his care and protection.

2.  The nightmare of abuse and complete lack of love and nurturing that was Raymond Tibbetts' childhood and the impact of that tragedy on the adults who survived it: Raymond Tibbetts and his siblings.

3.  Compelling testimony of those who knew and loved Raymond Tibbetts and could provide the sentencer with reason to spare his life

4.  A comprehensive evaluation by a psychological expert, based upon a complete and accurate history upon which to assess and diagnose Raymond Tibbetts' mental disorders and the source of his polysubstance abuse . . . . the records of the mitigation specialist make it clear that they had the information necessary to obtain this important evidence, but they dropped the ball. For instance:

    a.  The Petitioner's father was contacted in June, but they *never met* him *or asked him to testify* (The Respondent, in its return ignores the following basic fact- *the Petitioner's father was available and willing* to testify and his testimony could have been offered-and further, it was not and could not have been offered in any detail through Dr. Weaver);

    b.  Trial counsel failed to follow up and obtain school records or records from Droege House, a rehabilitation facility (again, the Respondent notes that the mitigation specialist requested this information, but obviously never followed up, or entered it into evidence, despite the fact

that this mitigation specialist is represented as very capable by the Respondent

c.     The defense failed to interview Petitioner Tibbetts' Alcoholic Anonymous sponsor, *despite the fact that they possessed the releases and information necessary to do so* (the Respondent does not address this issue, the availability of a man who could have testified to his long involvement with Ray in relation to his substance abuse problems which were a central issue in this case)

d.     In addition, Robin Amburgey was never called to testify in mitigation on Raymond's behalf, despite her expressed willingness to testify and the fact that she was available and had testified for the prosecution earlier in the trial. She was not called in spite of the fact that the mitigation specialist had Ms. Amburgey's telephone number and the investigator interviewed Robin Amburgey and knew she had vital information relating to mitigation. . . . Again, the Respondent does not address this issue in its return. Robin was very willing to testify on behalf of Raymond, as evidenced by her appearance at trial for the state. She was perhaps the person most familiar with Raymond's history of substance abuse, and also his history of positive relations as a father to his child, as evidenced by her testimony at trial, but she was never called to offer anything in mitigation on Raymond's behalf.

(Traverse, Doc. No. 14 at 21-22) (Emphasis in the original). He supports the above contentions with

affidavits from his father, sister, Alcoholic Anonymous sponsor, and a childhood friend.[3] The

affidavits show that they would have been willing to testify on Tibbetts' behalf had they been asked

---

[3] Nothing was offered to show that Robin Amburgey would have been willing to testify on Tibbetts' behalf during the mitigation phase had she been asked to do so.

41

to do so. Aff. of Suzanne Terry ¶ 5, 20, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B 155-158)[4]; Aff. of Stanley Tibbetts ¶ 2, 9, April 20, 1999 (Return of Writ, Doc. No. 13, Apx.Vol. III-B 162-163); Aff. of Donald Keith Riddell ¶ 6, May 17, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B 164-165); Aff. of Sandra Nunley ¶ 13, May 4, 1999 (Return of Writ, Doc. No. 13, Apx.Vol. III-B159-161).  Additionally, they could have provided the following information:

1.   Father, Stanley Tibbetts, was a cruel alcoholic and did not have a sober day until he quit drinking at age 69.  Mother was a drug addict.  She may have had a borderline personality.  The children were not given any affection from their mother. Aff. of Suzanne Terry ¶ 6, 16-17, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

2.   Sister, Suzanne, served as the mother figure to the younger children. Aff. of Suzanne Terry ¶ 6, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

3.   Raymond Tibbetts and his siblings were often left alone without food or proper clothing.  Food was donated to them and on one occasion the principal from the school bought Suzanne shoes. Aff. of Suzanne Terry ¶ 7, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

4.   The family home was place of violence.  Stanley Tibbetts beat his wife and occasionally his children. Aff. of Suzanne Terry ¶ 7-8, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

5.   Three of the boys, including Raymond Tibbetts, were taken from their home and placed with the Merrimans.  Suzanne and another sibling were placed in foster care. Aff. of Suzanne Terry ¶ 10, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

---

[4] Suzanne Terry was contacted by Jim Crates to testify on her brother's behalf during the mitigation phase of trial.  This contact came one day before she was needed to give testimony. Aff. of Suzanne Terry ¶ 2, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B 155-158).  She asked not to be filmed during her testimony but was told this was not possible. *Id* at ¶ 3.  She then stated she would be willing to testify on camera if she could have a short continuance to allow for her to give notice to her colleagues, their mentally challenged clients, and the clients' families, so as to warn them of the nature of the case and the nature of her testimony. *Id*. at ¶ 5.  Again she was told this could not be arranged. *Id*.  She then decided not to testify for these reasons. *Id*. at ¶ 4.  Defense counsel told her it would be "good enough" for her to speak with the psychiatrist testifying in the case. *Id*. at ¶ 5.  Suzanne Terry stated that had she known that the information would not have been conveyed to the jurors through the psychiatrist or if she had been given time to contact her clients she would have been willing to testify. *Id*. at ¶ 20.

6.      The children were treated poorly at the Merriman's home. Aff. of Stanley Tibbetts ¶ 3, April 20, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at162-163).

7.      Mrs. Merriman was a drug addict. Aff. of Suzanne Terry ¶ 11, 12, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

8.      The Merriman children brutalized the Tibbetts children.  They kicked them down the stairs, told them things would get them, had fingers beaten with spatulas and burned on registers. Aff. of Suzanne Terry ¶ 11, 12, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

9.      Ray Tibbetts and two of his siblings were tied in bed at night with no sheets.  During the day they were set in the corner of the kitchen and had to stay there all day until it was time for bed. Aff. of Suzanne Terry ¶ 11, 12, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

10.     The Tibbetts children were not fed properly.  They were usually fed plain oats and for lunch given two pieces of bread with cheese in between. Aff. of Suzanne Terry ¶ 13, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

11.     The children were often locked outside, once for a duration long enough to cause one of the brothers to suffer from a bowel impaction. Aff. of Suzanne Terry ¶ 14, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

12.     Mr. Merriman once tried to sexually molest Suzanne. Aff. of Suzanne Terry ¶ 14, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

13.     Eventually Suzanne and another sibling returned home to their mother.  The mother, however, refused to take her three other children, including Raymond.  Instead she acted as if they did not exist.  On at least one occasion the children came to visit her and she refused to see them.  She eventually cut these three children out of her will. Aff. of Suzanne Terry ¶ 16, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158); Aff. of Stanley Tibbetts ¶ 4, April 20, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 162-163).

14.     Raymond did not have a close relationship with his father, though they did try to keep in contact. Aff. of Stanley Tibbetts ¶ 6, April 20, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 162-163).

15.     The boys were also treated poorly at their next foster home, the Oswald's. Aff. of Stanley Tibbetts ¶ 5, April 20, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 162-163).

16.     Raymond went to the Children's Protestant Orphanage when he was about 15 years old. Aff. of Sandra Nunley ¶ 2, May 4, 1999 (Return of Writ, Doc. No. 13, Apx. Vol.

III-B at 159-161).

17.    The orphanage was very strict.  While there was no physical abuse, discipline was harsh and the children were not permitted to do much of anything.  While all the children at the home attended public school they were not permitted to visit with friends outside of school.  Nor were the kids shown any affection from the people that ran the orphanage.  Raymond never had any family members visit him.  Aff. of Sandra Nunley ¶ 3, 4, 8, May 4, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 159-161).

18.    Nunley, another child at the orphanage, met Raymond during recreation time. They "clicked" right away and fell in love.  She noticed that Raymond seemed to want a lot of affection but they were not even allowed to hug. Aff. of Sandra Nunley ¶ 6, May 4, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 159-161).

19.    All the children in the Tibbetts family have turned to alcohol or drugs to deal with their rage at one point or another, with the exception of Suzanne, who suffers from fybromyalgia as a result of supressing her rage for so long. Aff. of Suzanne Terry ¶ 15, Feb. 5, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 155-158).

20.    Raymond Tibbetts attempted to become sober but had problems getting through the Alcoholics Annonymous program.  He believed someone was trying to set him up, so he left the program and eventually ended up back in prison.  He later tried to sober up again.  This was around the time he had moved in with Robin.  He seemed very serious and tried very hard to get sober but was never able to really put together a significant period of time when he was sober. Aff. of Donald Keith Riddell ¶ 2,3, May 17, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 164-165).

21.    When Raymond was sober he was good-hearted, kind and a good guy.  When Raymond was drinking and doing drugs he was a scoundrel and a criminal and a drunk. Aff. of Donald Keith Riddell ¶ 5, May 17, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 164-165).

22.    Raymond seemed to straighten out when he met Robin Amburgey and had a son.  He is a good father. Aff. of Stanley Tibbetts ¶ 7,9, April 20, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 162-163).

23.    Did not know Raymond to be a violent person. Aff. of Stanley Tibbetts ¶ 7, April 20, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 162-163); Aff. of Sandra Nunley ¶ 12, May 4, 1999 (Return of Writ, Doc. No. 13, Apx. Vol. III-B at 159-161).

After a thorough review of the mitigation phase transcript, this Court concludes that

information regarding the following aspects of Tibbetts' life were brought out from witness testimony: Tibbetts had a miserable and horrible childhood (T.p. 1421); his parents were drug users and his father was an alcoholic (T.p. 1421-1422); the primary caretaker in the home was Tibbetts' 10 year old sister, Suzanne (T.p. 1422); there was no touching of affection shown to the children either at home or in foster homes (T.p. 1422); Human Services found out about the situation and the children were removed from their home and put into foster care (T.p.1422); Tibbetts would have been about 4 years old at this time, during the formative years which occur the first five or six years of life (T.p. 1422,1467); Tibbetts was essentially "damaged goods" by the time he was 5 years old (T.p. 1434); the foster homes were not happy places (T.p. 1467); One foster home, the Merrimans, treated the children like animals, tying Tibbetts and his brothers into the bed at night with no sheets or pillows (T.p. 1467); Records from social services show that the placement in the next foster home, the Oswalds, was a good and long term placement (T.p. 1466-7, 1486); Tibbetts received good grades in school and preferred being at school to being at home because of "the hollering, belts, etc." (T.p. 1517 ); He enjoyed sports but felt that his foster parents did not care about his achievements in athletics, his education or life in general (T.p. 1517); Tibbetts was later placed in the Children's Protestant Orphanage where he received some support (T.p. 1423); Tibbetts enjoyed playing football but he suffered a knee injury and had to quit (T.p. 1423, 1470); he started using drugs and alcohol around the age 14 or 15 (T.p. 1426, 1468-9); he began to get into trouble with the law around this time and was eventually confined to Boys Industrial School (T.p. 1423, 1471); he had multiple arrests and was ordered into a drug rehabilitation program (T.p. 1425); once released he met Robin and things started to go well for him. He was sober and going to Alcoholic Anonymous meetings and had a job as a welder on a barge (T.p. 1425, 1439); Tibbetts re-injured

45

his knee on the job and was prescribed addictive pain medicine by his doctor which in turned enabled Tibbetts to begin abusing drugs again (T.p. 1425, 1440); Tibbetts also suffered from depression (T.p. 1440-1442); a few months before the murders Tibbetts was admitted to St. Elizabeth Hospital for psychological problems.  During this first hospitalization in July he was psychotic and suffered from auditory hallucinations which commanded him to kill himself (T.p. 1420);  a few months later in September police found Tibbetts down on the riverbank, drunk and saying he wanted to kill himself.  He was readmitted to St. Elizabeth (T.p. 1427); while a patient at St. Elizabeth Tibbetts tried to hang himself but was resuscitated.  He was placed in seclusion and restraints for the remainder of his treatment (T.p. 1420 1427);  this occurred around the same time period during which he lost his job and Robin asked him to leave the home (T.p. 1426, 1438); while out binging on alcohol and drugs Tibbetts ran in to his former girlfriend, Sue, who was also abusing substances.  The two married almost immediately (T.p. 1427); at the time of the murders Tibbetts was a heavy abuser of drugs and alcohol.  During the day and evening of the murders Tibbetts had consumed a large amount of alcohol and drugs including cocaine, alcohol, opiate, Percocet, and Valium (T.p. 1419, 1448-9); Tibbetts was aware of the extent of his substance abuse problem but was too embarrassed to ask for help.  He prayed to God to take away his addictions (T.p. 1518-9).

In examining the defendant, Dr. Weaver was concerned that Tibbetts may have had a brain injury as he had a history of head injuries, including a time when he fell on a rock. (T.p. 1463-5.) He administered the Rorschach test to determine if Tibbetts suffered from any neuropsychological or neurological deficits. (T.p. 1472.)  These tests were all negative but Dr. Weaver conceded that people can have a psychological disorder even without the presence of organic brain damage. (T.p. 1500.)  After a review of a previously administered MRI it was  concluded that Tibbetts suffered

from no abnormality except a possibly in the sinus area which was possibly compatible with narcolepsy but wasn't relevant in this case. (T.p.1503.)  Additionally, results from a MMPI which had been previously administered at the Department of Corrections were reviewed. (T.p. 1472.)

Dr. Weaver also requested that Tibbetts take a Minnesota Multiphasic Personality test. (T.p. 1429.)  Based on the results he determined Tibbetts to be an individual with limited personality resources or control and subject to instances of explosive rage, particularly with the use of alcohol or drugs. (T.p 1431, 1434, 1450.)  He further determined that Tibbetts was an individual addicted to substances and as a result he suffered from dissociative episodes with no recall for what he did during that time period. (T.p.1449.)  It was the doctor's opinion that Tibbetts' horrible childhood played into his substance abuse and the events surrounding the murders in that Tibbetts' limited control and substance abuse were the direct result of his background and beyond his control. (T.p. 1433, 1434,1436.)  The Department of Human Services failed in that they did not recognize Tibbetts' need and provide him with proper psychological help when he was a young child. (T.p. 1468.)  As a result his substance abuse problem in combination with his poor impulse control and depression has made Tibbetts a "walking timebomb" and an accident waiting to happen. (T.p. 1437, 1451.)

He further opined that Tibbetts' use of substances was an attempt to self-medicate and noted that substance abuse is a recognized disease by the American Medical Association. (T.p. 1433, 1440-41.)  Tibbetts simply did not have the ability to stop taking drugs. (T.p. 1433,1436.) Dr. Weaver did not feel that Tibbetts would have qualified for a not guilty by reason of insanity plea but did feel that Tibbetts did not have ability to conform his conduct to the requirements of the law. (T.p. 1450, 1457.)  Additionally he offered testimony that Tibbetts would benefit and his behavior would

remain under control if placed in a medium or maximum security correctional setting. In this type of setting, with the correct drug therapy, Tibbetts' propensity for violence would lessen and he would be a productive person. He illustrated this by noting to the jury that Tibbetts had always expressed an interest in vocational type skills and might be able to utilize such skills successfully in a prison environment. (T.p. 1443-1446.)

Finally, additional testimony was presented in mitigation; Tibbetts obtained his G.E.D. and took college level courses while incarcerated at Lebanon and was remorseful for the murders of Hicks and Crawford. (T.p. 1447, 1516, 1519-1520.) The records that were reviewed for mitigation included: Department of Human Services Records, St. Elizabeth Hospital Records, Employment records of McGinnis, Inc, Transcript from Anderson High School, Report of Dr. Glenn Weaver, Ohio Department of Corrections Records, Report of Robert Tureen, Ph.D.. (T.p. 1428-1429.)

This Court finds that the majority of the mitigating evidence offered in the affidavits was in fact presented in this stage of trial through the testimony of Dr. Glen Weaver and/or Tibbetts' own unsworn statement. While the information may not have been presented in the most thorough manner possible or with all possible witnesses, it seems clear that counsel did in fact investigate and present adequate mitigation evidence, and that the information provided in the post-conviction affidavits was cumulative. The decision of the state courts on this claim was neither unreasonable nor a contrary application of law. This claim is therefore without merit.

**Sixth Claim for Relief**

> Petitioner's constitutional rights to freedom from cruel and unusual punishment and due process of law were violated by the presumptive use of electrocution in carrying out a death sentence in Ohio at the time of petitioner's death sentence.

In his sixth ground for relief, Tibbetts argues that his constitutional rights to freedom from cruel and unusual punishment and due process of law were violated by the presumptive use of electrocution in carrying out a death sentence in Ohio. (Petition, Doc. No. 5 at 20-22.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 42.)

**Seventh Ground for Relief**

> Petitioner's right to due process was violated by the ineffective assistance of trial counsel in failing to investigate and present evidence to counter the damaging characterization by the state that petitioner was deceptive and attempted to conceal himself from law enforcement.

In his seventh ground for relief, Petitioner makes the argument that his rights were violated by counsels' ineffectiveness in their failure to investigate and present evidence to counter the characterization by the prosecution that Tibbetts had been deceptive by attempting to conceal himself from the police. (Petition, Doc. No. 5 at 23-25.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 37.); she argues instead that the analysis of the court of appeals was correct. *Id*. at 36-38.

In order to succeed on this claim Petitioner must demonstrate that counsel were ineffective under the *Strickland* analysis by showing that 1) the assistance of counsel was so deficient that counsel was no longer functioning as "the counsel guaranteed the defendant by the Sixth Amendment" 2) and that he suffered prejudice as the errors were so serious as to deprive him of a fair trial with a reliable result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984)**.**

Petitioner does not meet either prong.  In support of his claim Petitioner argues that he had misrepresented information to the staff at St. Elizabeth on multiple occasions in the past.  In his petition he cites to examples of reporting to the staff that he only had two brothers when in fact he

has three and stating that his lung wound was the result of a bullet when it was actually caused by a stab wound.  Additionally he denied his drug use to the staff. (Petition, Doc. No. 5 at 23); (Traverse, Doc. No. 14 at 45.)  Therefore, he concludes that counsel were ineffective in their failure to point out to the jury that it was not out of the ordinary for Petitioner to lie about his identity or history to the intake staff at St. Elizabeth Hospital and that Tibbetts was not lying about his identity in an attempt to hide from the police but simply because he is a liar.

This Court finds Petitioner's argument extraordinarily unpersuasive.  Counsels' decision not to present the past examples of misrepresentation could well have been a strategic choice: presenting a client as a chronic liar is hardly the best way to explain away his lie on a particular occasion. Strategic choices made by counsel when there is more than one possible defense are virtually unchallengeable. *Strickland*, 466 U.S. at 690; *Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984). Even assuming that Petitioner could meet the first prong he is unable to establish prejudice.  Based on the other information given at trial this was not the most damaging piece of evidence and this Court does not see how the failure on the part of counsel to highlight Petitioner's additional lies was prejudicial.  The decision of the state court was neither unreasonable nor a contrary application of federal law.  This ground for relief is without merit.


**Eighth Ground for Relief**

> Petitioner's right to due process was violated by the prosecutor's failure to provide exculpatory evidence of the victim's violent history at his capital trial.

Next Petitioner raises the claim that his rights were violated because of the prosecutor's failure to provide exculpatory evidence relating to the victim's violent history. (Petition, Doc. No.

5 at 26-27.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 106.) Respondent argues that this claim is without merit because Tibbetts; 1) knew of the supposedly exculpatory information, 2) presented no evidence that the State was aware of the stabbings, and 3) presented no substantial evidence that Sue Crawford actually stabbed anyone. *Id*.

To establish a *Brady* violation, Tibbetts must demonstrate that the government possessed and suppressed information which was both favorable to the accused and material to guilt because it is exculpatory or impeaching, defendant did not have knowledge of such evidence, and such failure to disclose deprived defendant of a fair trial. *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickler v. Greene*, 527 U.S. 263, 282-83 (1999); *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994).

Tibbetts cites the following information as being suppressed *Brady* material, to wit: the victim's [Sue Crawford] prior investigations and convictions for violence against others, including numerous incidents where she stabbed others with knives, resulting in the death of one victims, and that she had been convicted and spent time in prison for assaulting a woman with a broken glass bottle. (Petition, Doc. No. 5 at 26.)

Tibbetts offers no substantial evidence that the State knew and withheld this information. In fact, expert witness for the defense, Dr. Glen Weaver, gave testimony during mitigation that Crawford had stabbed Tibbetts on a prior occasion resulting in injury. T.p. 1464. Additionally, according to his affidavit Petitioner was aware of Crawford's past. Aff. of Raymond Tibbetts ¶ 5, May 11, 1999 (Return of Writ, Doc. No. 13, Apx. Vol.III-B at 153-154.)

The *Brady* standard is only relevant in claims in which the government possesses information which defendant does not. *Mullins*, 22 F.3d at 1371. There is no *Brady* violation if the defendant

51

knew or should have known the essential facts permitting him to take advantage of the information in question or if the information was available to him from another source. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998); *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000). Tibbetts knew of the information and was the one that actually supplied this information to his attorneys and the court. Aff. of Raymond Tibbetts ¶ 5, May 11, 1999 (Return of Writ, Doc. No. 13, Apx. Vol.III-B at 153-154.) Because this information was known to him, rather than suppressed by the State, Tibbetts cannot establish that the material was *Brady* material. The decision of the State courts were neither contrary to nor an unreasonable application of federal law. This claim is without merit.

**Ninth Ground for Relief**

> Petitioner's right to due process was violated by the ineffective assistance of trial counsel in failing to investigate, discover and present evidence of the victim's prior history of violence at his capital trial.

In his ninth ground for relief Tibbetts argues that his counsel were ineffective in failing to investigate, discover, and present evidence of the victim's prior history of violence, including her history of stabbing. (Petition, Doc. No. 5 at 28-30.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 39.) Respondent argues that this information of prior violence on the part of the victim would have been inadmissible. *Id*. at 39-41.

Again, in order to succeed on this claim Petitioner needs to set forth that his counsel was ineffective under the *Strickland* standards. *Strickland v. Washington*, 466 U.S. 668 (1984). Tibbetts contends that it was prejudicial in that he was aware of Crawford's violent history and was willing to give counsel the information but that they told him that they did not intend on pursuing

information relating to the victim's character and background. (Petition, Doc. No. 5 at 29.)

Tibbetts argues that this information was relevant to show the volatile past relationship between Crawford and himself. *Id.* Tibbetts also argues that because of Crawford's past propensity for violence, specifically stabbing, it is conceivable that Crawford was the one that actually killed Hicks and that Petitioner killed Crawford in either a reaction to the killing of Hicks or in self-defense if Crawford had turned against Petitioner. *Id.*

Tibbetts testified to the fact that he and Crawford have had prior altercations in which she stabbed him. (T.p. 1152-1153.) He further told the jury that "Sue liked knives and would go crazy if one was around." *Id.* One fight resulted in a stab wound to Tibbetts' lung and he had to be hospitalized for two weeks. *Id.* He testified that on another occasion Sue stabbed him in the back of the upper leg resulting in a wound that was about three and a half or four inches deep and needed to be stitched and patched. *Id.* There is no evidence that the jury failed to consider this information during their deliberations. To the contrary, it was considered as he received a lesser sentence for the death of Crawford than that of Hicks.

Tibbetts also argues that there was past evidence that Crawford had stabbed three others, resulting in the death of one, and that she had been convicted of assaulting a woman with a broken glass bottle. (Petition, Doc. No. 5 at 28); (Traverse, Doc. No. 14 at 48.) As support for this claim Tibbetts submitted his own affidavit, identifying the other stab victims as Terry, Steve Kirby, and someone named Gibson. Aff. of Raymond Tibbetts ¶ 5, May 11, 1999 (Return of Writ, Doc. No. 13, Vol.III-B at 153-154).[5] Aside from the Tibbetts' Affidavit and a police citation involving Crawford

---

[5] "I knew that Sue Tibbetts had a long history of stabbing people. She had stabbed a man named Terry, a man named Steve Kirby, and someone by the name of Gibson who later died of complications from the stabbing. She also spent some time in the Penitentiary for cutting a woman with a beer bottle. I would have provided all of this information to my trial attorneys but they told me that they weren't going to investigate her background and that

assaulting someone with a pool cue stick, the record does not contain any records in reference to the alleged stabbings or to the assault with the broken glass. To be admissible Tibbetts needed to produce either 1) someone who saw the acts occur, or 2) produce certified copies of convictions. The Court of Appeals in Hamilton County, which was the last state court to review this claim on the merits stated that:

> We note, furthermore, that Tibbetts testified during trial to two previous incidents in which, he claimed, Crawford had stabbed him when they were living together. Thus the jury was informed of these alleged incidents. It appears from his own affidavit that his trial attorneys made a tactical decision not to attempt to further attack the victim's character by linking her to other alleged stabbings, for which there might not have been any solid evidence. To pursue such an attack could have easily backfired. As for the potential mitigating value of evidence that Crawford had stabbed other people, even if it existed, its effect on the jury in a case involving two murders, each with multiple stab wounds, strikes us as arguable at best.

*State v. Tibbetts*, 2001 Ohio App. Lexis 1472 (1st Dist. Ohio 2001).

Furthermore, Tibbetts did not make the argument of self-defense, nor would he have met the requirements had he tried. In Ohio, to show self-defense one must demonstrate that 1) the defendant was not at fault in creating the situation giving rise to the argument; 2) the defendant had an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and 3) the defendant did not violate any duty to retreat or avoid the danger. *Martin v. Ohio*, 480 U.S. 228 (1987); *State v. Robbins*, 58 Ohio St. 2d 74, 388 N.E. 2d 74 (1979). Because Tibbetts claims that he was in a blackout he cannot demonstrate that he was not responsible, that he was in imminent danger, or that he could not have avoided the danger.

---

we weren't going to go into it at trial." Aff. of Raymond Tibbetts ¶ 5, May 11, 1999 (Return of Writ, Doc. No. 13, Apx. Vol.III-B at 153-154.)

For the same reasons Crawford's prior history of violence against others should not have been given additional weight in mitigation as Tibbetts argues,[6] as he cannot show by a preponderance of the evidence that; 1) the victim of the offense induced or facilitated it; 2) whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation; or 7) any other factors that are relevant to the issue of whether the offender should be sentenced to death. Ohio Revised Code § 2929.04(B)(1)(2) and (7).

Therefore, counsels' decision not to present additional information as to Crawford's past was a strategic decision. The decision of the appellate court was neither unreasonable nor contrary to federal law. This claim is without merit.

**Tenth Ground for Relief**

> Petitioner's right to due process was violated when the trial court permitted the state to introduce statements obtained from Raymond Tibbets [sic] in violation of his constitutional rights.

In his tenth ground for relief, Petitioner advances the claim that his rights were violated when the trial court permitted the state to introduce statements obtained from Tibbetts in violation of his constitutional rights. (Petition, Doc. No. 5 at 31-33.) Specifically Tibbetts points to the use of comments made to arresting officers while he was medicated and under supervision in a psychiatric ward. *Id*. at 31. He argues that because he was experiencing auditory hallucinations, acute alcohol withdrawal, suicidal ideation, and was medicated, his waiver of rights and subsequent statements

---

[6] It appears from the jury's decision to recommend a lesser sentence on a count pertaining to Crawford, and death in all counts pertaining to Hicks that the jury may have in fact taken the volatile relationship between Tibbetts and Crawford into account

were not given voluntarily. *Id*.

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 56.)


**Eleventh Ground for Relief**

>Petitioner's right to due process was violated by the ineffective assistance of trial counsel in failing to investigate and present evidence of his drugged and extremely compromised mental condition at the time he made statements to officers, at his capital trial.


In his eleventh ground for relief Tibbetts states that his rights were violated because of the ineffectiveness of his counsel in failing to investigate and present evidence of his drugged and compromised mental condition at the time he made statements to the officers. (Petition, Doc. No. 5 at 34-36.)

Respondent concedes that this claim is not procedurally defaulted.(Return of Writ, Doc. No. 13 at 43.)

In his post-evidentiary hearing brief, Petitioner concedes that upon reviewing the materials, case law, and evidence from the evidentiary hearing he cannot meet the standard as set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993) and waives this ground for relief. (Petitioner's Brief on Evidentiary Hearing Evidence, Doc. No. 35 at 2.)


**Twelfth Ground for Relief**

>Petitioner's right to due process was violated when the trial court permitted the state to introduce statements made by Petitioner to nurses during a part of the admission and treatment process, at his capital trial.


Next Tibbetts argues that his rights were violated as a result of the trial court permitting the

state to introduce statements made by Petitioner to a nurse during his admission for treatment at St.

Elizabeth's Hospital. (Petition, Doc. No. 5 at 37-39.)

Petitioner concedes that the procedural bar of *res judicata* is applicable to this claim.

(Traverse, Doc. No. 14 at 61.)

**Thirteenth Ground for Relief**

> Petitioner's right to due process was violated by the ineffective
> assistance of trial counsel in failing to investigate exculpatory
> evidence at the crime scene and to permit their investigator to access
> vital evidence necessary to conduct an effective investigation [sic] his
> capital trial.

In his thirteenth ground for relief Petitioner argues that his rights were violated due to

ineffective assistance of counsel as a result of their failure to investigate exculpatory evidence at the

crime scene and permit their investigator access to such vital evidence necessary to conduct an

effective investigation. (Petition, Doc. No. 5 at 40-41.)

Respondent looks to the decision of the First District Court of Appeals which concluded that

any prejudice Tibbetts may have faced would have been hypothetical. (Return of Writ, Doc. No. 13

at 19-20.)  Respondent concedes that this claim is not procedurally defaulted but argues that this

claim is without merit as Petitioner fails to identify any reason as to why his counsel should have

investigated the crime scene. (Return of Writ, Doc. No 13 at 20.)  Additionally Respondent cites to

Tibbetts' expert who states that the evidence he reviewed "developed no new relevant evidence

which excludes or includes Mr. Tibbetts as a perpetrator." *Id.*  Therefore, Respondent asserts,

Petitioner has not been able to show prejudice.

In addressing this claim the state court held that there was no evidence that further crime

57

scene examination would have produced any exculpatory evidence, and therefore the claim was speculative and without merit. *State v. Tibbetts*, 2001 LEXIS 1472, *8-9, 32 (1st Dist. Ohio 2001). Tibbetts now makes the same argument before this Court. He argues that the jury was prevented from considering and giving effect to critical evidence because of counsels' failure to thoroughly examine the crime scene and to allow the investigator access to certain evidence. (Petition, Doc. No. 5 at 41.) He fails, however, to articulate what exculpatory evidence would have been discovered or what information his investigator was not permitted to view. *Id*. Rather he speculates in a conclusory fashion that evidence "which *might* have been present at the crime scene"could have been collected and presented at trial. (*Emphasis added*); *Id*. Tibbetts' own expert, hired for post-conviction proceedings, conceded that the evidence he reviewed "developed no new relevant evidence which excludes or includes Mr. Tibbetts as a perpetrator." (Return of Writ, Doc. No. 13, Apx. Vol. III-A at 87.) While Tibbetts asserts his investigator stated that other experts were necessary, aside from a pathologist, he fails to explain what type of expert was needed or what they would have shown. Without such showing he does not meet the standards of *Ake v. Oklahoma*. 470 U.S. 68 (1985). As for the pathologist, Tibbetts has failed to establish that the services of a pathologist were reasonably necessary as neither the time nor manner of death were disputed in this case. *See Infra* Sixteenth Ground for Relief at 61.

Tibbetts has not meet the *Strickland* standard in any portion of this claim. The decision of the state courts was neither contrary to nor an unreasonable application of federal law. This ground for relief is without merit.

**Fourteenth Ground for Relief**

Petitioner's constitutional rights were violated by the administration

of the death penalty by lethal injection in the state of Ohio.

In his fourteenth ground Tibbetts advances the claim that his constitutional rights are violated by the administration of the death penalty by lethal injection. (Petition, Doc. No. 5 at 42-44.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 110.) Respondent, however, argues that this claim is without merit as Ohio's method of death by lethal injection has not been found to be unconstitutional by any court. *Id*. at 110-111.

Tibbetts does not provide this court with any citation to case law in which lethal injection was found to be cruel or unusual punishment. No court has found this method of execution to be constitutionally impermissible, this claim is without merit.

**Fifteenth Ground for Relief**

> Petitioner's right to due process was violated when the state failed to permit defense counsel's investigator to view, analyze and examine the evidence in his case at his capital trial.

In his fifteenth ground for relief Tibbetts asserts that the prosecutor refused to permit defense investigator, Joe Determan, access to review or examine evidence in this case. (Petition, Doc. No. 5 at 45-46.) He argues that he was therefore unable to discover and develop potential exculpatory evidence. *Id*.

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 107.) Respondent makes the argument that this claim is without merit because Petitioner fails to identify any evidence that was supposedly withheld. *Id*.

Petitioner merely speculates as to the fact that evidence was withheld and that any information contained therein would have provided exculpatory evidence material to his case.

*Bowling, Jr. v. Parker*, 138 F. Supp. 2d 821, 885 (E.D. Ky 2001).  In support of this claim Tibbetts

offers an affidavit from Determan. (Petition, Doc. No. 5 at 45); Aff. of Joseph Determan, May 11,

1999 (Return of Writ, Doc. No 13, Apx. Vol. III-C at 247-248.)  Tibbetts asserts that Determan was

not allowed to review or examine evidence which impeded on his ability to conduct an effective

investigation and discover and develop *potential* material and exculpatory evidence which *might*

have been found. (Petition, Doc. No. 5 at 45)[emphasis added.]  Petitioner has not established that

the material existed, that it was *Brady* material, or that with such information there is a reasonable

probability that the result of the trial would have been different.  For the above reason and for

reasons articulated in the thirteenth ground for relief, this claim is without merit.


### Sixteenth Ground for Relief

> Petitioner's right to due process was violated by the ineffective
> assistance of trial counsel in their numerous actions and failure to act
> on his behalf during their representation at his capital trial.


In his sixteenth ground for relief Tibbetts argues that because of counsels' ineffectiveness

in their numerous actions and failure to act on his behalf, his rights have been violated. (Petition,

Doc. No. 5 at 47-48.)  Specifically Petitioner cites to the following two examples of counsels'

alleged ineffectiveness to support this claim, failure to request an independent expert pathologist and

failure to heed advice of the investigator in developing evidence in regards to the cause, manner, and

timing of the deaths. *Id*.

Respondent concedes that there is no procedural default. (Return of Writ, Doc. No. 13 at 45.)

To support his claim Tibbetts cites to Ohio Revised Code § 2929.024 which states:

> If the court determines that the defendant is indigent and that
> investigation services, Experts, or other services are reasonably
> necessary for the proper representation of a defendant charged with
> aggravated murder at trial or at the sentencing hearing, the court shall
> authorize the defendant's counsel to obtain the necessary services .
> . . .

Ohio Rev. Code § 2929.024;(Traverse, Doc. No. 14 at 75.)  Again, as stated in the Thirteenth

Ground for Relief, aside from his conclusory allegations that a pathologist was reasonably necessary,

Petitioner fails to offer any support for this claim as to how counsels' performance was deficient or

prejudicial in their failure to consult such expert. *See Supra* Thirteenth Ground for Relief at 58-59.

The victims in this case were found with the murder weapons- knives- still stuck in their

bodies. (T.p. 736, 746, 797-806, 885, 1021-1023, 1025, 1029, 1052.)  A baseball bat was found in

near proximity to Crawford's body. (T.p. 1023.)  Therefore, it seems unlikely that a pathology expert

for the defense would have been necessary to develop further evidence as to the cause or manner of

death.  Furthermore, Petitioner does not establish that the time of death was material and that he

needed his own expert to assure fairness in this regard.  Therefore, counsels' performance was not

deficient and this claim is without merit.


**Seventeenth Ground for Relief**

> Petitioner's right to due process was violated by the admission of
> gruesome and otherwise prejudicial photographs which were
> cumulative of each other as well as other evidence.

Tibbetts asserts that his rights were violated by the admission of gruesome and prejudicial

photographs in his seventeenth ground for relief. (Petition, Doc. No. 5 at 49-50.)

Respondent concedes that this ground for relief is not procedurally defaulted. (Return of

Writ, Doc. No. 13 at 77.)  Respondent argues that the decision of the Ohio Supreme court was neither contrary to, nor an unreasonable application of clearly established law from the United States Supreme Court. *Id.*  Additionally Respondent argues that this claim is not cognizable and does not merit relief in federal habeas proceedings. *Id.*

An order to show cause was issued on August 11, 2005, asking Petitioner to show why this ground for relief should not be dismissed because of his failure to present the photographs in question to this Court. (Order to Show Cause, Doc. No. 40.)  Petitioner responded by dismissing the claim voluntarily. (Motion to Voluntarily Dismiss Claim Seventeen, Doc. No. 41); (Order Granting Motion to Dismiss, Doc. No. 42.)

**Eighteenth Ground for Relief**

> Petitioner's right to due process was violated by the requirement that the mitigating factors in his capital sentencing proceeding be proven by a preponderance of the evidence.

In his eighteenth ground for relief Tibbetts claims that his rights were violated by the requirement that mitigating factors must be proven by a preponderance of the evidence. (Petition, Doc. No. 5 at 51-52.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 84.)

**Nineteenth Ground for Relief**

> Petitioner's right to due process was violated by the Ineffective[sic] assistance of counsel in Petitioner's direct appeal to the Ohio

Supreme Court.

In his nineteenth ground for relief Petitioner argues that he received ineffective assistance of counsel on his direct appeal. (Petition, Doc. No. 5 at 53-57.)

Respondent concedes that this claim is not procedurally defaulted as the Ohio Supreme Court summarily rejected Tibbetts' Application to Reopen. (Return of Writ, Doc. No. 13 at 46.)

Petitioner has withdrawn the majority of allegations of ineffective assistance of counsel as set forth in his original Petition. (Petition, Doc. No. 5 at 54-56);(Traverse, Doc. No. 14 at 86.)  He narrows his argument down to include the following claims of ineffectiveness:

> Proposition of Law No. 7:[7]
> The trial court erred when it permitted the state to introduce statements by nurses treating Raymond Tibbett's[sic] regarding his statements to them as part of the admission and treatment process, in violation of Mr. Tibbett's[sic] rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.
>
> Proposition of Law No. 21:
> The trial court erred when it provided a "no sympathy charge" to the jury in the guilt and mitigation instructions, in violation of Mr. Tibbett's[sic] rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.
>
> Proposition of Law No. 31:
> The trial court erred when it failed to consider all relevant information, which supported the imposition of a sentence of less than death, in violation of Mr. Tibbett's[sic] rights under the Eighth and Fourteenth Amendments to the United States Constitution.
>
> Proposition of Law No. 35:
> The legal proceedings against Mr. Tibbetts contained too many errors to result in a reliable imposition of the death penalty, in violation of Mr. Tibbett's[sic] rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

---

[7] The proposition of law header refers to the claim where addressed in Petitioner's Application for Reopening filed in the Ohio Supreme Court. (Traverse, Doc. No. 14 at 86.)

(Traverse, Doc. No. 14 at 88-99.)

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland* and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001). The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745 (1983)  Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *See Smith v. Murray*, 477 U.S. 527 (1986). However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999). "Counsel's performance is strongly presumed to be effective." *McFarland, quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*).

Tibbetts argues his appellate counsels' ineffectiveness in that they failed to raise the claim that the trial court erred when it permitted the state to introduce statements by nurses treating Tibbetts at St. Elizabeth regarding his statements to them as part of the admission and treatment process. (Petition, Doc. No. 5 at 55.)  This claim was raised as an independent ground for relief in the now withdrawn Twelfth Ground for Relief. *See supra* at 57.  Specifically, the referenced testimony is comments from Peggy Rowekamp and Sally Smith that Tibbetts admitted himself into

the hospital as Ray Harvey and Rowkamp's opinion that Tibbetts was a drug seeker. (Petition, Doc. No. 5 at 37, 55.)

First this Court will address the portion of the claim that pertains to the false name given during the admission process.  Tibbetts argues that the communications made by himself to the nurses of St. Elizabeth during the admission process were confidential under the physician-patient privilege under Ohio Rev. Code 4732.19 and Ohio Rev. Code 2317.02. (Traverse, Doc. No. 14 at 88-89.) Counsel objected at trial on the basis of this privilege. (T.p. 930.)  The prosecutor stated that he was going no further into the communications made between Tibbetts and the witness than the name given at the time. *Id.*  The court overruled the objection. *Id.*

The state statutory right to privacy in medical records has been recognized in the Federal Court. *Mann v. University of Cincinnati*, 824 F. Supp. 1190, 1196 (6th Cir. 1993) *citing In Re Zuniga*, 714 F.2d 632, 642 (6th Cir. 1983); *General Motors Corps. v. Director of the National Institute for Occupational Safety and Health*, 636 F.2d 163, 166 (6th Cir. 1980).  This right is not absolute however. *Mann*, 824 F. Supp at 1196.  Rather, the courts have applied a balancing test which weighs the potential conflict between the asserted right of access to medical records and the patient's right of privacy. *Id*.  Additionally, privilege may be waived by the client. Ohio Rev. Code § 2317.02 (B)(1);

This Court finds that any privilege pertaining to the communication made by Tibbetts to the nurses admitting him into St. Elizabeth Hospital has been waived.  The privilege was effectively waived when he himself gave extensive testimony regarding his treatments at St. Elizabeth for depression and substance abuse, (T.p. 1137-1139, 1169-1173.), specifically his testimony pertaining to the last time he was a patient at St. Elizabeth, days after the murder, in which he detailed the

65

admission process in question and stated that he told the nurses he was Ray Harvey and the conversation that ensued to determine his true identity. (T.p. 1169-1173, 1211-1213.)  By placing his medical conditions and treatments into evidence and by testifying as to what occurred during the admission process on this particular occasion, he effectively waived any physician-patient privilege. Furthermore, because of his own statements, Petitioner cannot show he suffered any prejudice arising the testimony of the nurses and from appellate counsels' failure to bring the claim on direct appeal.  This portion of the claim is without merit.

Next the Court turns to the comment made by Nurse Rowkamp that it was her opinion that Tibbetts was a drug seeker. (T.p. 942-943, 945.)  Tibbetts is not able to meet the *Strickland* standard on this portion of the claim.  Even assuming that Rowkamp's "drug seeker" comment was improper opinion testimony, Tibbetts did not suffer any prejudice.  This comment would have in fact strengthened Tibbetts' position that he suffered from substance abuse and was unable to control his use.  This sub-claim is without merit.

Tibbetts next  argues that his direct appeal counsel was ineffective in their failure to raise the claim that the trial court did not permit jurors to consider sympathy or mercy for the defendant. (Traverse, Doc. No. 14 at 90-91.)  The Supreme Court has held that"the sentencer must **rationally** distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Zuern v. Tate*, 101 F. Supp. 2d 948 (S.D. Ohio 2000).  The jury must of course listen sympathetically to the mitigating evidence.  That is, they are required to accept as mitigating those factors which the Supreme Court has held are proper to be considered in mitigation.  But they may not exercise general sympathy.  This is to ensure that the death penalty is not administered in an arbitrary and unpredictable manner. *Gregg v. Georgia,* 428

U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972).  Counsel were not ineffective in their failure to raise this claim.

Next Tibbetts argues that counsel were ineffective in their failure to raise on appeal that the trial court erred when it failed to consider all mitigating evidence. (Traverse, Doc. No. 14 at 91.) Petitioner argues that the Ohio Supreme Court's reweighing fails under the Eighth and Fourteenth Amendments because he was denied "the opportunity to have the trial court consider mitigation." (Traverse, Doc. No. 14 at 92-93.)  He argues that the state supreme court considered evidence not previously considered as mitigating evidence and that the jury and trial court were never able to consider and weigh such evidence. *Id*. at 93.  Petitioner further argues that his case is materially indistinguishable from *Eddings v. Oklahoma*, 455 U.S. 104, 109, 113 (1982).  The Supreme Court held that in *Eddings* the trial judge, *as a matter of law*, did not to consider the Defendant's violent upbringing as a mitigating factor, and thus violated his constitutional rights. 455 U.S. 104, 113-114 (1982).  Applying *Eddings*, this Court now turns to the sentencing opinion in Tibbetts.

In the sentencing opinion the trial judge summarized the sentencing hearing evidence as follows:

> The State moved that all of the evidence adduced at the guilt or innocence trial be admitted into evidence at the sentencing trial.
> The Court admitted all of the evidence that was relevant to the State proving the existence of aggravating circumstances in the sentencing trial.
> The defense presented Dr. Glenn Weaver, psychiatrist, who opined, among other things, that the Defendant did not recall the happenings of November 5, 1997, that due to an unnurtured and bad childhood Mr. Tibbetts was "damaged goods" as early as five (5) years old, Defendant was a "hooked" substance abuser, Defendant was an "explosion waiting to happen," the Defendant has a limited ability to control his rage and the Defendant is "not playing with a full deck."
> The Defendant provided an unsworn statement to the jury

where he stated his sorrow if he committed the aggravated murders. He asked forgiveness if he killed Ms. Crawford and Mr. Hicks. He further indicated his involvement with substances of abuse and his inability to control that abuse.

(Return of Writ, Doc. No. 13, Apx. Vol. I at 470-471.)

The trial judge further stated:

The mitigating factors alleged and considered are as follows:

"Whether at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;"

"Any other factors that call for a penalty less than death or lessen the appropriateness of the death penalty."

*Id.* at 471-472.

The trial judge then articulated factors that were considered and the amount of weight afforded the mitigating factors:

The Defendant presented evidence as to two (2) mitigating factors only. The Court must make a finding as to the existence of any mitigating factors pursuant to Ohio Rev. Code 2929.04 (B).

1.    Lack of substantial capacity to appreciate the criminality of the offender's conduct.

The Defendant testified that on the date in question his ingestion of a number of substances combined to cause him not to remember what his actions were relative to the brutal slayings of Judith Sue Crawford and Fred Hicks.

Dr. Glenn Weaver, a psychiatrist appointed by the Court, testified in length regarding the Defendant's suggested lack of substantial capacity to appreciate the criminality of his conduct.

There is no question that the Defendant has abused substances for a number of years. There is certainly the possibility that on the day in question the Defendant ingested substances of abuse. The Defendant may have had incidents or problems in his prior history and/or upbringing.

However, there is nothing before this Court that indicates on

68

any probative level that the mitigating factor in question requires a penalty less than death.

The Defendant was competent to stand trial.  The Defendant's memory was intact (except, of course, regarding the murders of Judith Sue Crawford and Fred Hicks).  The Defendant did not in any way qualify for a plea of not guilty by reason of insanity.

The evidence presented is devoid of the requisite proof to show the lack of substantial capacity.

2.       "Any other factors that call for a penalty less than death or lessen the appropriateness of the death penalty."

The Court has reviewed all the evidence relevant to this mitigating factor and finds no factor of any significance whatsoever that calls for a penalty less than death or lessens the appropriateness of the death penalty.

* * * *

The factors raised in opposition to the aggravating circumstances are inconsequential.  Though some may find the Defendant's childhood, substance abuse problem, "apology," etc. to provide mitigation, this Court does not.

*Id*. at 472-4.

In contrast to *Eddings* Tibbetts offers no evidence that his right to present such mitigation was in fact limited in the trial court nor does he provide evidence that the trial court did not permit the consideration and weighing all mitigation evidence.  As evidenced by the above excerpts, the trial court did in fact consider mitigating factors as prescribed in Ohio Rev. Code 2929.04 (B).  The opinion specifically states "[t]he Court must make a finding as to the existence of *any* mitigating factors pursuant to Ohio Rev. Code 2929.04 (B)." (Return of Writ, Doc. No. 13, Apx. Vol. I at 472-4)(*emphasis added*.)  Additionally, one of the factors considered by the court was Ohio Rev. Code 2929.04 (B)(7) which provides a "catch-all" in that "any other factors that are relevant to the issue of whether the offender should be sentenced to death" should be considered.  It appears that the judge did in fact consider mitigating factors and find that they did not outweigh the aggravating circumstances, as opposed to the judge in *Eddings*, who thought that, *as a matter of law*, he was not

permitted to even consider such evidence. As long as the factors presented are considered the sentencer and the courts on reweighing may determine the amount of weight to be given to mitigating factors. *Eddings*, 455 U.S. at 115. Furthermore, errors by the sentencing court in weighing aggravating and mitigating factors can be cured by reweighing in the state appellate court. *Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies the requirements of *Clemons. Cooey v. Coyle,* 289 F.3d 882, 888-90 (6th Cir. 2002). *See also Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005).

In his next sub-claim, Tibbetts argues that his appellate counsel were ineffective in their failure to preserve a claim of cumulative error. This Court rejects this claim. Multiple non-meritorious claims cannot be combined into a "cumulative effect" claim. Post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker*, 425 F.3d 250 (6th Cir. 2005), *citing Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002).

Appellate counsel cannot be found to have been ineffective as Petitioner has failed to show that there was a reasonable probability that inclusion of these omitted claims would have changed the result of the appeal. This ground for relief is without merit.


**Twentieth Ground for Relief**

> Petitioner's right to due process was violated by a lack of funds to
> adequately defend himself in this litigation.

In his twentieth ground for relief Tibbetts advances the claim that his rights were violated due to an inadequate amount of funds to defend himself in this litigation. (Petition, Doc. No. 5 at

58.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 101.)

**Twenty-First Ground for Relief**

> Petitioner's right to due process was violated because the judgment
> of conviction of aggravated murder is unsupported by legally
> sufficient evidence and is contrary to the manifest weight of the
> evidence.

Next Petitioner argues that his rights were violated because there is insufficient evidence

to support his conviction. (Petition, Doc. No. 5 at 59-61.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 101.)

**Twenty-Second Ground for Relief**

> Petitioner's right to due process was violated because Petitioner was
> denied reasonable bond.

In his twenty-second ground for relief Petitioner raises the claim that his rights were violated

because he was denied reasonable bond. (Petition, Doc. No. 5 at 62.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 101.)

**Twenty-Third Ground for Relief**

> Petitioner was denied effective assistance of counsel by defense
> counsel's failure to raise the issue of his competency and enter a plea
> of not guilty by reason of insanity, as Petitioner has no recollection
> of the alleged crime, was arrested in the psychiatric unit of a hospital,
> had a history of mental illness and the plea offered a reasonable
> to[sic] defense to the charges and also, where counsel failed to make
> proper objections at trial.

71

Petitioner asserts in his twenty-third ground for relief that his rights were violated due to counsels' ineffective assistance in their failure to raise the issue of competency or to enter a plea of not guilty by reason of insanity as he had no recollection of the crime, was arrested while he was a patient at the psychiatric unit of the hospital, and has a history of mental illness. (Petition, Doc. No. 5 at 63-72.)  Additionally he argues that counsel were ineffective in their; failure to file motions to suppress, during the opening statement, guilt phase, and penalty phase, and additionally during jury deliberation.

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 49, 52, 55, 57, 60,63, 65.)

Petitioner has withdrawn the first two sub-claims of this ground for relief. (Traverse, Doc. No. 14 at 102.)

In his post-evidentiary hearing brief, Petitioner concedes that upon reviewing the materials, case law, and evidence from the evidentiary hearing he cannot meet the standard as set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993) and waives this ground for relief. (Petitioner's Brief on Evidentiary Hearing Evidence, Doc. No. 35 at 2.)

**Twenty-Fourth Ground for Relief**

> Petitioner was denied due process when the trial court admitted improper hearsay evidence which evidence related to proof of a necessary element of the prosecution's case.

Next Tibbetts argues that he was denied due process when the trial court admitted improper hearsay evidence which related to proof of a necessary element of the state's case. (Petition, Doc.

No. 5 at 73-77.)

Respondent argues that this claim is procedurally defaulted. (Return of Writ, Doc. No. 13 at 93.)  Alternatively, Respondent argues that this claim lacks merit as it is a state evidentiary ruling and not reviewable under federal habeas proceedings unless the fundamental fairness of the trial has been so undermined it constitutes a denial of due process. *Id*. at 94-95.

Petitioner concedes that the Ohio Supreme Court held waiver for failure to object at trial and reviewed the claim for plain error and as a result this claim is now defaulted.  Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 108.)

## Twenty-Fifth Ground for Relief

> Petitioner was denied due process when the trial court admitted an inculpatory duplicate of an altered videotape which was never properly authenticated and to which there was no evidence presented regarding the process involved in the alteration of the videotape, and the evidence was introduced to prove the actual content of the videotape.

In his twenty-fifth ground for relief Petitioner makes the argument that he was denied due process when the trial court admitted a duplicate of an altered videotape. (Petition, Doc. No. 5 at 78-79.)  Tibbetts argues that the tape was not properly authenticated and the process used to alter the videotape was not properly presented. *Id*.

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 110.)

## Twenty-Sixth Ground for Relief

> Petitioner was denied due process when the trial court allowed the state to introduce evidence of "other acts" claimed to have been committed by the Petitioner.

In his twenty-sixth ground for relief Tibbetts argues that the trial court improperly allowed the state to introduce evidence of "other acts" claimed to have been committed by the Petitioner. (Petition, Doc. No. 5 at 80-82.)

Petitioner concedes that the Ohio Supreme Court held waiver for failure to object at trial and reviewed the claim for plain error and as a result this claim is now defaulted.  Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 111.)

**Twenty-Seventh Ground for Relief**

> Petitioner was denied due process when the trial court denied his motion to suppress evidence despite the state's failure to demonstrate that the arrest of Petitioner was lawful and based upon probable cause.

In the twenty-seventh ground for relief Petitioner argues that his rights were violated when the trial court denied his motion to suppress evidence despite the state's failure to demonstrate that the arrest of Petitioner was lawful and based on probable cause. (Petition, Doc. No. 5 at 83-84.)

Petitioner has withdrawn this ground for relief. (Traverse, Doc. No. 14 at 112.)

**Twenty-Eighth Ground for Relief**

> Petitioner was denied due process when the trial court denied his motion to suppress statements made by Petitioner, where the state failed to demonstrate that those statements were made after a knowing and voluntary waiver of his rights.

Next Tibbetts argues that the trial court improperly denied his motion to suppress statements made by himself to detectives when the state has failed to demonstrate that the statements were made after a knowing and voluntary waiver of rights. (Petition, Doc. No. 5 at 85-88.)

Respondent concedes that there is no procedural default. (Return of Writ, Doc. No. 13 at 69.) Respondent argues, however, that the Ohio Supreme Court's decision was neither contrary to nor an unreasonable application of United States Supreme Court precedent. *Id*.

The Ohio Supreme Court held that the trial court was correct in allowing the statement into evidence:

> In his fifteenth proposition, Tibbetts argues that the trial court should have suppressed statements he made to police following his arrest for receiving stolen property.  After being read his <u>*Miranda*</u> rights, Tibbetts signed a form waiving those rights and allowed police to question him.  After police asked Tibbetts if he had seen his wife recently, Tibbetts asked to terminate the interview and the questioning ceased.  Before the officers left the room, however, Tibbetts asked them, "What's the charge, manslaughter?"  The trial court denied Tibbetts's motion to suppress, concluding that any statements Tibbetts gave were voluntary.
>
> It is undisputed that police questioned Tibbetts during a custodial interrogation, to which the Fifth Amendment privilege against compelled self-incrimination attaches. *See Miranda v. Arizona* (1966), 384 U.S. 436, 460-461, 86 S.Ct. 1602, 1620-1621, 16 L.Ed.2d 694, 715-716.  But a statement is not "compelled" within the meaning of the Fifth Amendment if a suspect voluntarily, knowingly, and intelligently waives his privilege. *Colorado v. Spring* (1987), 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 965.  "'Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'" *Id*., *quoting Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421; *see, also, State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854.  Among the relevant circumstances to consider are "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of any threat or inducement.'" *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208, 1226, *quoting State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.
>
> Tibbetts points to several factors that supposedly show lack of

75

voluntariness. First, he emphasizes the interrogating officer's admission that Tibbetts was "groggy" at the time of the questioning due to medication he had taken earlier in the day. Second, the officer knew that Tibbetts had taken a fifty-milligram dose of medication but was "not familiar" with the drug's effect on the mind or body. Finally, Tibbetts points to the pretextual nature of the interrogation. Although Tibbetts had been arrested for receiving stolen property, the interrogation was for the purpose of investigating the murders of Hicks and Crawford. We disagree with Tibbetts and find that none of these factors, either collectively or individually, undermines the conclusion that Tibbetts's post-arrest statements were voluntary.

The fact that the interrogating officers sought to question Tibbetts about the murders, and not the charge for receiving stolen property, does not indicate involuntariness. The United States Supreme Court rejected such an argument in Spring, holding that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Spring*, 479 U.S. at 577, 107 S.Ct. At 859, 93 L.Ed.2d at 968; *accord State v. O'Neal* (2000), 87 Ohio St.3d 402, 413, 721 N.E.2d 73, 86.

We also reject the claim that the medication and recent hospitalization at a psychiatric ward rendered Tibbetts's statements involuntary. The interrogating officer testified that he fully advised Tibbetts of his rights and that Tibbetts was calm and cooperative. The officer also testified that Tibbetts appeared to understand the questions asked of him and did not seem intoxicated during the questioning. The trial court's findings were consistent with this testimony and we are in no position to question them; we must defer to the trial court's factual findings concerning voluntariness so long as the record supports them. *See State v. Keene* (1998), 81 Ohio St. 3d 646. 656, 693 N.E.2d 246, 257. Moreover, there is no evidence to suggest, and Tibbetts does not allege, any physical coercion or other tactics by police designed to break his will. *Spring*, 479 U.S. at 574, 107 S. Ct. at 857, 93 L. Ed. 2d at 965, *citing Oregon v. Elstad* (1985), 470 U.S. 298, 312, 105 S.Ct. 1285, 1295, 84 L. Ed. 2d 222, 234. The interrogation was brief and ceased upon Tibbetts's request to terminate it.

One of Tibbetts's utterances- - his inquiry about whether the police were charging him with manslaughter- - came after he had invoked his right to terminate the questioning. There is no basis, however, for

76

> suppressing even this statement.  Tibbetts volunteered this inquiry after the interrogating officers told him they would leave.  Hence, there was no *Miranda* violation that would warrant suppression. *See Edwards v. Arizona* (1981), 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L. Ed. 2d 378, 387; *State v. Raglin* (1998), 83 Ohio St.3d 253, 262-263, 699 N.E.2d 482, 491.  We reject the fifteenth proposition of law.

*State v. Tibbetts*, 92 Ohio St. 3d 146, 154-155, 749 N.E. 2d 226, 243-244 (2001).

This Court agrees that there was no *Miranda* violation.  Questioning must cease and cannot resume after a defendant has invoked his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *Edwards v. Arizona*, 451 U.S. 477 (1981).  This does not apply, however, if a defendant initiates further communication. *United States v. Whaley*, 13 F.3d 963, 967 (6th Cir. 1994); *United States v. Josephson*, 1997 U.S. Dist. Lexis 23786 (S.D. Ohio 1997).  If the person in custody initiates further communication, neither the Fifth nor Fourteenth Amendments prohibit police from listening to the voluntary, volunteered statements and using them against the defendant at the trial. *Edwards,* 451 U.S. at 485-486.

Having decided that issue, the Court now turns to whether or not the statement was made voluntarily.  Under the guidelines of *Colorado v. Springs*, to waive constitutional privilege within the meaning of the Fifth Amendment:

> First the relinquishment of the right must have been voluntary in a sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Colorado v. Springs*, 479 U.S. 564, 573 (1987) *quoting Fare v. Michael C.*, 442 U.S. 707, 725

(1979); *see also Faretta v. California*, 422 U.S. 806, 835 (1975); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979); *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

To prove a *Miranda* violation based on the fact that the confession was unknowing or unintelligent, a totality of the circumstances test must be applied. *Spring*, 479 U.S. at 574. Here the officers were aware of the fact that Tibbetts was currently a patient in the a psychiatric unit and had been given medication earlier that day. (T.p. 103, 112.) They admitted that they were unfamiliar with the side effects of the medication but stated that Tibbetts' speech was not slurred nor did he seem to be influenced in what he was thinking, saying or doing, rather he was calm, cooperative, attentive, and lucid in his answers throughout the interview. (T.p. 103-105; 916.) Officers noted that Tibbetts seemed a little groggy or sleepy but he did not appear to be "under the influence." (T.p. 103-105.) Tibbetts, himself, indicated that he was not under the influence of anything, was literate, and that he understood that he had the right to remain silent and anything he said could be used as evidence against him. (T.p. 105-106.) Perhaps the biggest indication that Tibbetts' waiver was knowing and intelligent is the fact that Tibbetts invoked his right to silence when questioning turned from receipt of stolen property to the topic of his wife. Based on this invocation it appears that Tibbetts had a requisite level of comprehension as to his rights.

Finally, under Due Process analysis, the defendant's mental condition is a mere significant factor in the "voluntariness" equation. *See Spano v. New York*, 360 U.S. 315 (1959). Rather, the Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) at 167; *see also Clark v. Mitchell*, 425 F.3d 270, *31-33(6th Cir. 2005); *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989)

(articulating that "evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary.")  There are three factors used to determine if a confession is coerced: 1) whether the police extorted the confession from the accused by means of coercive activity; 2) whether the police activity, if objectively coercive, was sufficient to overbear the will of the accused; and 3) whether the accused proved that his will was overborne by the coercive police in question. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).  While Tibbetts may be able to show that his mental capacity was compromised, he does not establish police overreaching.  This claim must fail under the totality of the circumstances test.  The decision of the state courts' was neither unreasonable nor contrary to established federal law.  This ground for relief is without merit.

**Twenty-Ninth Ground for Relief**

> Petitioner was denied due process when the trial court applied Ohio's statutory definition of reasonable doubt in the mitigation phase of his capital trial.

In his twenty-ninth ground for relief Petitioner argues that his rights were violated when the trial court applied Ohio's statutory definition of reasonable doubt in the mitigation phase of his capital trial. (Petition, Doc. No. 5 at 89-93.)

Respondent concedes that this claim is not procedurally defaulted. (Return of Writ, Doc. No. 13 at 104.)  Respondent argues, however, that this claim is without merit as the Sixth Circuit has already ruled that Ohio's statutory definition of reasonable doubt does not offend due process. *Id.*

Specifically, Petitioner contends that Ohio's statutory definition of reasonable doubt sets an

unconstitutionally low standard in deciding whether a person is sentenced to death. (Petition, Doc.

No. 5 at 89-93.)  Ohio Rev. Code § 2901.05 (D) states:

> "Reasonable doubt" is present when the jurors, after they have
> carefully considered and compared all the evidence, cannot say they
> are firmly convinced of the truth of the charge.  It is a doubt based on
> reason and common sense.  Reasonable doubt is not mere possible
> doubt, because everything relating to human affairs or depending on
> moral evidence is open to some possible or imaginary doubt.  "Proof
> beyond a reasonable doubt" is proof of such character that an
> ordinary person would be willing to rely and act upon it in the most
> important of his own affairs.

This particular instruction has been held by the Sixth Circuit Court of Appeals to be constitutional.

*Scott v. Mitchell*, 209 F.3d 854, 883-883 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir.

2000); *Thomas v. Arn*, 704 F.2d 865 (6th Cir. 1983).


**Thirtieth Ground for Relief**

> Petitioner was tried, convicted and sentenced to death under an
> invalid death penalty scheme and hence an unconstitutional death
> penalty law and was denied his rights a[sic] guaranteed by the U.S.
> Const. Amend. V, VI, VIII, IX, XIV.

In his thirtieth ground for relief Tibbetts makes the argument that he was tried, convicted,

and sentenced to death under an invalid death penalty scheme. (Petition, Doc. No. 5 at 94-112.)

Respondent concedes that portions of this claim have been preserved for habeas review.

(Return of Writ, Doc. No. 13 at 113.)

In his first sub-claim, Tibbetts makes the argument that the death penalty is unconstitutional

because it constitutes cruel and unusual punishment. (Amended Petition, Doc. No. 5 at 95.)  That

claim has been rejected by the Sixth Circuit Court of Appeals in a previous case. *Buell v. Mitchell*, 274 F.3d 337, 367 (6th Cir. 2001).

Tibbetts further states that the Ohio death penalty statutory scheme is unconstitutional because it affords the prosecutor unregulated discretion in determining whom to charge with a capitally-eligible offense and this results in racial disparities. (Amended Petition, Doc. No. 122 at 91.)  The Supreme Court held in *McClesky v. Kemp* that statistical studies suggesting racially-motivated disparities in the selection and prosecution of death penalty cases are insufficient to support a claim that such discriminatory practices occurred in the petitioner's case. 481 U.S. 279 (1987).  Tibbetts has produced no evidence that the decision-makers in his particular case acted in a discriminatory manner.  The same claim has been rejected by this Court in *Zuern v. Tate*, 101 F. Supp. 2d 948, 1002 (S.D. Ohio 2000), *on the authority of Gregg v. Georgia*, 428 U.S. 153 (1976).

In support of the sub-claim above, Tibbetts challenges that the death penalty does not serve a legitimate and compelling state interest achieved by the least restrictive means. (Amended Petition, Doc. No 5 at 96.)  The Constitution, however, does not required that the legislature use the least severe penalty possible as long as the penalty selected is not "cruelly inhumane or disproportionate to the crime involved." *Gregg*, 428 U.S. at 175; *Williams v. Bagley*, 380 F.3d 932 (6th Cir. 2004) *accord. Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001).

Next Tibbetts argues that the imposition of the death penalty fails to meet the least restrictive means. (Petition, Doc. No. 5 at 96.)  This claim is without merit as the death penalty has been upheld by the Supreme Court of the United States. *Williams v. Bagley*, 380 F.3d 932 (6th Cir. 2004) *accord. Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001).

Next Tibbetts argues that Ohio's capital sentencing scheme results in unreliable sentencing

81

procedures. (Petition, Doc. No. 5 at 96-97.)  Specifically he argues that Ohio does not meet Due Process and Equal Protection Clauses in that it does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty and that Ohio's death penalty statutes fails to provide sufficient guidance on how to determine the existence of mitigating factors and fails to establish a standard by which to balance the mitigating factors against the aggravating circumstances. . *Id*.  The United States Supreme Court has never held that "the state must affirmatively structure in a particular way the manner in which juries must consider mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).  The Court notes, too, that the Ohio statutes clearly place the burden of proving the existence of any mitigating factors on the defendant in a capital case, Ohio Rev. Code § 2929.03(D)(1), and a requirement that the defendant do so by a preponderance of the evidence does not offend the federal constitution. *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) *overruled in part by Ring v. Arizona*, 536 U.S. 584 (2002).

Next Tibbetts asserts that Ohio's capital sentencing scheme is unconstitutional because of a lack of individualized sentencing (Petition, Doc. No. 5 at 97-98.)  First he makes the argument that it is unconstitutional because it requires proof of aggravating circumstances in the trial phase of the bifurcated proceeding. *Id*. at 97.  That argument has been rejected by this Court in *Zuern v. Tate*, 101 F. Supp. 2d 948, 1003-04 (S.D. Ohio 2000), *on the authority of Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994).

Tibbetts argues that his right to a jury is burdened in that Ohio's death penalty statutory scheme unconstitutionally encourages capital defendants to plead guilty. (Petition, Doc. No. 5 at 98.) He argues that the scheme as it exists, imposes an impermissible risk of death on capital defendants

who choose to exercise their rights to a trial as opposed to those who plead. *Id*. The same claim was rejected in *Zuern*, 101 F. Supp. 2d 948, 1004-05, *on the authority of Corbitt v. New Jersey*, 439 U.S. 212 (1978); *accord. Scott v. Anderson*, 58 F. Supp. 2d 767, 796 (N.D. Ohio 1998), *rev'd in part on other grounds*, *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000).

Next Tibbetts argues that Ohio's statute is unconstitutional due to the requirement that if a capital defendant requests investigation reports and mental evaluations they must be submitted to the jury or judge once requested. (Petition, Doc. No. 5 at 98-99); *see* Ohio Rev. Code § 2929.03 (D)(1) (Anderson 2003). This claim has been previously rejected. *Williams v. Bagley*, 380 F.3d 932 (6th Cir. 2004); *Cooey v. Coyle*, 289 F.3d 882, 925-26 (6th Cir. 2002); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000); *Dennis v. Mitchell*, 68 F. Supp. 2d 863, 904 (N.D. Ohio 1999).

In his next sub-claim Tibbetts argues that the definition of mitigating factors in Ohio Rev. Code 2929.04 (B)(7) violates the reliability component of the Eighth Amendment. (Petition, Doc. No. 5 at 99-100.) His argument concerns the fact that the State does not have the burden of proving an absence of mitigating factors in the sentencing phase, nor is the State required to make a showing that death is the only appropriate sentence. The United States Supreme Court has never held that "the state must affirmatively structure in a particular way the manner in which juries must consider mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). The Court notes as well that the Ohio statutes clearly place the burden of proving the existence of any mitigating factors on the defendant in a capital case, Ohio Rev. Code § 2929.03(D)(1), and a requirement that the defendant do so by a preponderance of the evidence does not offend the federal constitution. *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) *overruled in part by Ring v. Arizona*, 536 U.S. 584 (2002).

In his next claim Tibbetts argues that Ohio Rev. Code § 2929.04 (A)(7) is constitutionally invalid when used to aggravate Ohio Rev. Code §2903.01 (B) aggravated murder. (Petition, Doc. No. 5 at 100-102.) Specifically he states that this fails under constitutional standards because it fails to genuinely narrow a class of individuals eligible for the death penalty and because it allows an element of aggravated murder to be considered as an aggravating circumstance in the mitigation phase of trial. *Id.* To be constitutional, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231 (1988) *quoting Zant v. Stevens*, 462 U.S. 862, 877 (1983).  Under the Ohio capital sentencing scheme, the jury is required to find at least one aggravating circumstance before imposing a death sentence, creating a narrowing of the class of persons that may be eligible for the sentence.  Furthermore, an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself. *Williams v. Taylor*, 529 U.S. 362 (2000) *citing Lowenfield v. Phelps*, 484 U.S. 231 (concluding the Ohio statutory scheme is not constitutionally infirm on the ground stated here.)

Tibbetts challenges the constitutionality of Ohio Rev. Code § 2929.03(D)(1) and § 2929.04 as being vague. (Petition, Doc. No. 5 at 102-105.)  In his first sub-claim he asserts that the reference to "the nature and circumstances of the aggravating circumstance" incorporates these factors to be weighed in favor of death. *Id*. at 102.  This claim has been previously rejected. *Cooey v. Coyle*, 2000 U.S. App. LEXIS 38700 (6th Cir. 2000).  In his next sub-claim he argues that this fails to provide guidance to the sentencer in weighing the aggravating circumstances and mitigating factors, thus

84

giving them unfettered discretion. (Petition, Doc. No. 5 at 102-105.)  This portion of the claim has already been discussed and found to be without merit in an above sub-claim.

Next he asserts asserts that Ohio law provides inadequate appellate review of the proportionality of death sentences. (Petition, Doc. No. 5 at 103-105.) This contention fails, however, as no proportionality review is constitutionally "required in every case in which the death penalty is imposed and the defendant requests it." *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001).  As this is not a constitutional right states are afforded great latitude in the review it does provide as it is an additional safeguard against arbitrarily imposed death sentences . . . ." *Pulley*, 465 U.S. at 50.  This ground for relief is denied.

Next Tibbetts argues that a change in the Ohio Constitution that provides less review to capital appellants whose crimes were committed on or after January 1, 1995 violates the Fourteenth Amendment and fails to provide the meaningful appellate review mandated by the Eighth Amendment. (Petition, Doc. No. 5 at 105-110.)  This change resulted in the removal of direct appeals of right to the court of appeals from the review procedure in capital cases. *Id*. Amendment to R.C. 2953.02 by 1995 Am. Sub. H.B. No. 4.  The Sixth Circuit has held that the reweighing by the Ohio Supreme Court under 2929.05(A) satisfies the requirements of *Clemons v. Mississippi*, 494 U.S. 738 (1990). *Baston v. Bagley*, 420 F.3d 632 (2005).  "The state has a wide discretion in respect to establishing its systems of courts and distributing their jurisdiction." *Bryant v. Akron Metro. Park Dist.*, 281 U.S. 74, 81 (1930).  The protections offered by the Ohio Constitution are in line with protections offered in other jurisdictions on this matter, with many states having a one-tier review system for capital cases and other states providing a two-tier system but requiring only that the case be reviewed by the state supreme court and not in the intermediate courts.  There is no constitutional

violation.  This sub-claim is without merit.

Next Tibbetts argues that the electric chair is cruel and unusual. (Petition, Doc. No. 5 at 105.) This sub-claim is moot as the state of Ohio no longer uses the electric chair as a means of execution. House Bill 362, signed by Governor Bob Taft on November 15, 2001, eliminated the choice of execution by the electric chair. *See* Ohio Rev. Code § 2949.22

In his final sub-claim, Tibbetts argues that sentencing an individual to death in violation of treaties to which the United States of America is a signatory violated the Supremacy Clause of the United States Constitution. (Petition, Doc. No. 5 at 110.) Tibbetts advances this sub-claim by stating that pursuant to the Supremacy Clause of Article VI of the United States Constitution, the judges of every state are bound by the terms of international treaties to which the United States is a party. *Id*.  This claim has been rejected by the Sixth Circuit in *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001) and *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001).  The agreements entered upon by the United States do not prohibit the death penalty and furthermore, each agreement has been approved with reservations that preserve the power of the States, within Constitutional limits, on the use of the death penalty. *Buell*, 274 F.3d at 371 *citing* Charter of the Organization of American States, 1951, 2 U.S.T. 2394, 2484.

**Conclusion**

In accordance with the foregoing analysis, it is respectfully recommended that the Petition for Writ of Habeas Corpus be dismissed with prejudice on the merits.

November 19, 2005.

s/ **Michael R. Merz**

Chief United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\Death Penalty\Tibbetts v. Bradshaw\Tibbetts v. Bradshaw R&R.wpd